JESSE MAXWELL vs. AIG DOMESTIC CLAIMS, INC., & another.[1]

No. 07-P-1858.

Suffolk. June 2, 2008. - September 23, 2008.

Present: LENK, BERRY, & WOLOHOJIAN, JJ.

*"Anti-SLAPP" Statute. Malicious Prosecution. Emotional Distress. Workers' Compensation Act, Insurer.*

In a civil action alleging malicious prosecution and intentional infliction of emotional distress, the defendants (a workers' compensation insurer and one of its employees) were not entitled to dismissal of the complaint pursuant to G. L. c. 231, § 59H, the "anti-SLAPP" statute, where the record demonstrated that the claims of the plaintiff (a currently homeless, injured employee to whom the insurer had denied workers' compensation benefits) were based fundamentally on the insurer's nonpetitioning activities, including the insurer's inadequate investigation of the plaintiff's workers' compensation claim, its efforts to compel the plaintiff to relinquish his benefits, and its refusal to pay for required surgery despite an administrative judge's order [694-696], and where, to the extent that the plaintiff's claims implicated the insurer's petitioning activity, the plaintiff met his burden of showing that such activity (here, the insurer's groundless urging of insurance fraud charges against the plaintiff) was devoid of reasonable factual support [696-697].

In a civil action brought against the defendants, a workers's compensation insurer and one of its employees, the trial court judge hearing a special motion to dismiss under G. L. c. 231, § 59H, the "anti-SLAPP" statute, did not err in determining that the employee was not exercising her own right of petition but was instead acting at all times on the insurer's behalf, and thus was not entitled to dismissal of the claims against her under the statute. [697]

CIVIL ACTION commenced in the Superior Court Department on October 31, 2005.

A special motion to dismiss was heard by *Charles T. Spurlock*, J.

*Myles W. McDonough* (*Nicholas W. Schieffelin* with him) for the defendants.

[1]Alice M. Hathaway.

*Chester L. Tennyson, Jr.,* for the plaintiff.

WOLOHOJIAN, J. The defendants appeal from the denial of their special motion to dismiss made pursuant to G. L. c. 231, § 59H, the so-called anti-SLAPP statute.[2] "Strategic litigation" is indeed implicated in this case, although not as the Legislature intended, nor as the defendants argue. The statute was enacted in order to protect ordinary citizens from meritless litigation brought by large private interests for the purpose of tamping or threatening citizens' rights to petition their government. See *Duracraft Corp.* v. *Holmes Prods. Corp.,* 427 Mass. 156, 161 (1998); *Matter of the Discipline of an Attorney,* 442 Mass. 660, 673 (2004). In this case the statute is instead invoked by the defendant workers' compensation insurer and one of its employees, claiming that their petitioning rights have been threatened by the plaintiff, a now-homeless, injured employee to whom the insurer denied workers' compensation benefits and against whom the insurer later groundlessly urged insurance fraud charges.

*Background.* On October 8, 2000, while working at the Bay State Paper Company (Bay State), the plaintiff, Jesse Maxwell, injured his shoulder, neck, and back by picking up a 100-pound drain grate. He promptly reported the injury to Bay State and sought medical treatment for the injury. X-rays and magnetic resonance imaging showed that he had a torn left rotator cuff. Maxwell's injuries limited the mobility, strength, and range of his left, dominant arm and caused him serious pain.

Maxwell attempted to return to work, but his injuries precluded him from resuming his duties. As a result, on October 18, 2000, Bay State's human resources coordinator completed a "First Report of Injury or Fatality" (a form of the Department of Industrial Accidents [DIA]), reporting the incident and stating that, as of that date, Maxwell was totally or partially incapacitated.

The record does not show what, if any, investigation Bay States' workers' compensation insurer, AIG Domestic Claims, Inc. (AIG), made after receiving this report or before denying Maxwell all benefits on October 31, 2000. The only reason AIG

---

[2] "The acronym SLAPP stands for 'strategic litigation against public participation.' " *Garabedian* v. *Westland,* 59 Mass. App. Ct. 427, 430 n.2 (2003).

gave for denying benefits was that it had not received medical documentation with the claim. That was rectified shortly thereafter when Maxwell, through his attorney, submitted to AIG medical records documenting his injury and his total disability. Despite the fact that its previous denial had purportedly been based only on the fact that it had not received medical documentation, nothing in the record shows that AIG reevaluated its position once it received the medical records.

Maxwell filed a claim with the DIA on November 29, 2000. At the same time, being without a job or benefits, he sought refuge in various homeless shelters, including the one at the Boston branch of the YMCA.[3] As a condition of residence at the YMCA shelter, Maxwell was required to participate in a job training program conducted by Community Work Services,[4] a requirement with which he complied from February, 2001, through May, 2001.

Community Work Services is a nonprofit organization that has been in operation since the late Nineteenth Century. The Community Work Services program in which Maxwell participated was a training program for those who are homeless and who, by virtue of their disabilities or economic challenges, cannot be employed in the competitive open labor market. The purpose of the program is to provide vocational and rehabilitative training to help people return to the workforce. Maxwell was never employed by Community Work Services, and he received neither earnings nor wages for his participation in the program.[5]

In April, 2001, AIG retained a private investigator to follow and observe Maxwell. There is nothing in the record to indicate why AIG decided to hire a private investigator, let alone any

[3]Maxwell remained in homeless shelters until 2006.

[4]He was told by Barry Knamm, the controller and personnel administrator of Community Work Services, that it was not a place of employment.

[5]Maxwell did receive a stipend from Federal grant money for his participation in the program. However, further evidence that Maxwell was not employed by Community Work Services and that the stipend was not earnings or wages included the following: (i) The stipend was not subject to Federal or State income taxes. (ii) Community Work Services does not contribute Social Security taxes for participants, nor does it contribute to the unemployment fund. (iii) Participants are not eligible for unemployment after leaving the program. (iv) Neither W-2 nor 1099 tax forms are issued to participants.

evidence in the record to suggest that AIG had any reason to believe that Maxwell was not entitled to benefits or had not truthfully submitted a claim. In any event, under AIG's direct supervision, the investigator conducted a preliminary investigation on April 3 and 4, 2001. First, the investigator searched motor vehicle records for Maxwell and his family.[6] No explanation is given, nor is one readily apparent, as to why AIG believed Maxwell's motor vehicle records — or those of his family members — bore on Maxwell's claim for workers' compensation benefits. Second, through surveillance and questioning, the investigator attempted to determine whether Maxwell continued to live on Stuart Street in Boston, his former address. He determined that Maxwell did not live there. However, the investigator, following AIG's instruction to suspend surveillance, did not pursue this line of inquiry further. As a result, the investigator did not discover that Maxwell was at this point living in a homeless shelter at the YMCA.

AIG next authorized the investigator to search court records for any criminal records relating to Maxwell. The record does not reflect what, if any, basis AIG had for imagining that Maxwell had a criminal history or, more importantly, how it might bear on, or relate to, his work injury or subsequent claim for benefits. No criminal records were found.

Maxwell underwent an examination by an impartial medical examiner (IME) on April 25, 2001. See G. L. c. 152, § 11A.[7] As part of his medical examination, Maxwell completed a

---

[6]No vehicles were found to be registered to Maxwell or other family members.

[7]Maxwell was diagnosed with "[l]eft shoulder, neck and left upper extremity pain with a very severe functional overlay." On July 31, 2001, Maxwell underwent an examination by a second IME, an orthopedic surgeon, who diagnosed a left shoulder rotator cuff tear and opined that Maxwell was not at his medical endpoint because "surgical repair of the left shoulder needs to be considered." Maxwell was unable to use his "left upper extremity in any purposeful fashion." On February 19, 2002, Maxwell underwent examination by a third IME. This doctor also concluded that Maxwell had sustained a left shoulder rotator cuff injury. He further found that Maxwell "has persistent partial disability in regard to his left shoulder joint, and this most likely will be of a permanent nature." In addition, he concluded that Maxwell was "unfit to perform any type of overhead work requiring use of his left arm and hand. I further consider him unfit to do any lifting with his left arm and hand over 10 pounds."

"Patient Information Sheet" that asked him, "Are you working now?" Maxwell responded, "No."

As previously arranged with AIG,[8] the investigator waited for Maxwell outside the IME's office. The investigator followed Maxwell as he took several forms of public transportation to the Naval Reserve Recruitment Center (recruitment center) in Quincy, where — for no more than an hour — the investigator observed Maxwell cleaning up trash and mopping the floor. For a couple of hours the following morning, the investigator again observed Maxwell carrying trash and mopping the floor at the recruitment center. Both days' observations were reported to AIG.

The next day the investigator submitted to AIG his final report, in which he concluded that "the claimant Jesse Maxwell is currently employed as a janitor at the Naval Reserve Recruitment Center in Quincy." The investigator's report does not indicate what, if anything, the investigator did to establish or verify that Maxwell was in fact employed as a janitor at the recruitment center. Indeed, Maxwell was not so employed. Rather, he was participating in the Community Work Services training program, and his activities at the recruitment center were part of that training.

On April 30, 2001, an administrative law judge heard Maxwell's workers' compensation claim. Prior to the hearing, apparently as part of an attempt on AIG's part to lay a perjury trap, AIG's counsel asked Maxwell to complete a DIA form entitled "Employee's Earnings Report." The form stated that Maxwell had "an affirmative duty to report to the insurer all earnings, including wages or salary from self-employment." Maxwell reported no earnings on the form and checked and signed a box stating, "I have not received earnings for any period in which I was entitled to receive Workers' Compensation Benefits."

The administrative judge ordered AIG to pay Maxwell total temporary incapacity benefits from October 9, 2000, to the date of the hearing and partial incapacity benefits from the following day forward. AIG was also ordered to pay Maxwell's medical

---

[8]On April 16, 2001, AIG had instructed the investigator to resume surveillance of Maxwell when he appeared at the IME's office.

costs under G. L. c. 152, § 30.[9] AIG did not appeal this order. Instead, on the same day as the administrative judge's award, it opened an internal fraud investigation based on its view that Maxwell had lied when he had completed the patient information sheet and the employee's earnings report.

The internal investigation was conducted by Tito Medeiros, who summarized his findings in a report dated May 28, 2001. Because it is included in Medeiros's report, we know that by that date AIG had been informed that Maxwell was involved with Community Work Services. However, the report incorrectly stated that Community Work Services was a "temp agency." Medeiros submitted his report, including this incorrect information, to the insurance fraud bureau (IFB),[10] and alleged that Maxwell was suspected of having engaged in insurance fraud by (a) working as a cleaning person for the recruitment center; (b) stating on the patient information sheet he filled out as part of the IME that he was not "working"; and (c) stating that he had no "earnings" when he filled out the DIA's employee's earnings report.

In June, 2001, Community Work Services provided a packet of documentation to AIG's counsel concerning Maxwell and the training program in which he participated. Among other things, the packet described the program and the nature of Maxwell's injuries. The record does not reflect that AIG forwarded this information to the IFB even though it clearly bore on (and undercut) the allegations of fraud that AIG had made against Maxwell.

On August 30, 2001, the IFB reported that it had "concluded that a material fraud, deceit or intentional misrepresentation" had occurred and referred the matter to the Suffolk County

---

[9]In contravention of this aspect of the administrative judge's ruling, AIG refused to authorize or pay for Maxwell's recommended rotator cuff surgery. It appears from the record that AIG has *never* authorized or paid for the surgery, despite demand from Maxwell and one of his physicians.

[10]"The insurance fraud bureau of Massachusetts is . . . a private entity . . . authorized by special act [of the Legislature] to combat insurance fraud in the workers' compensation and automobile insurance systems by investigating charges of such fraud and referring suspected violations for criminal prosecution." *Adams* v. *Liberty Mut. Ins. Co.*, 60 Mass. App. Ct. 55, 58 n.7 (2003). See *Commonwealth* v. *Ellis*, 429 Mass. 362, 363-365 (1999).

district attorney's office. That office, in turn, on October 10, 2001, charged Maxwell with workers' compensation insurance fraud, in violation of G. L. c. 152, § 14, and larceny in excess of $250, in violation of G. L. c. 266, § 30(1). The record does not contain any information to show that the IFB or the district attorney's office conducted any independent investigation. Instead, the evidence in the record is consistent with a finding that the IFB and the district attorney's office each relied on the investigation conducted by, and materials supplied by, AIG.

On December 5, 2001, Maxwell attempted suicide and was admitted to McLean Hospital, a psychiatric facility. Maxwell, still homeless, reported on admission that he was "tired of living," that he had previously been injured at work, that he had been denied workers' compensation, and that the insurance company was "trying to 'get him' for fraud."

Two weeks later, AIG asked Maxwell to "voluntarily" sign off on his workers' compensation benefits. In a subsequent confirmatory letter, defendant Alice Hathaway, alternatively described as AIG's "senior complex specialist" or "disability specialist," pointedly emphasized to Maxwell's counsel, "As you are aware, your client has been arraigned on Workers' Compensation Fraud and is due back in court . . . ." Hathaway continued:

> "It is our belief that it would be in your client's best interest to sign off of weekly compensation. Since you have declined my offer to have your client sign off benefits voluntarily, I will seek to terminate your client's benefits through the Department of Industrial Accidents."

On January 14, 2002, true to its word, AIG filed with the DIA a motion for redetermination and recoupment of benefits based on Maxwell's alleged fraud and the fact that (based on AIG's report) Maxwell had been criminally charged.

AIG followed this up with a letter to Maxwell's attorney on January 31, 2002, in which Hathaway offered to settle the case by dropping the motion for redetermination and paying Maxwell one dollar. Hathaway again emphasized the pendency of the criminal charges: "Please note that this offer did not include the

waving [*sic*] of any recoupment or dismissal of the pending criminal proceedings."

After his attempted suicide on December 5, 2001, Maxwell continued to suffer from mental illness, leading to his hospitalization on several occasions during 2001 and 2002.[11] Hathaway, apparently frustrated that the criminal proceedings had been postponed because of Maxwell's hospitalizations and that he refused to relinquish his benefits despite her reminders concerning the criminal charges, wrote to the district attorney's office on March 25, 2002. After mentioning several times that she believed Maxwell "conveniently signs himself into McLean's Hospital"[12] in order to avoid appearing in court, Hathaway asked that Maxwell be surrendered on an *unrelated* drug charge so that "we could suspend his weekly benefits." Hathaway had apparently earlier made the same request to Maxwell's probation officer, who had refused it.[13]

On April 24, 2002, the DIA conducted an extensive hearing on AIG's request that Maxwell's benefits be terminated and that he be ordered to repay what had already been paid to him. The evidence during that hearing (significant parts of which are in the record before us) included unambiguous and extensive testimony from the controller of Community Work Services concerning the nature of the program in which Maxwell had participated, the fact that he had received no earnings or wages, that he had not been employed, and that his participation had been required as a condition to being allowed to stay at the YMCA homeless shelter. Despite this *uncontradicted* testimony during the DIA hearing, AIG continued to urge that the criminal charges be pressed.

On November 13, 2003, Maxwell pleaded guilty to the criminal charges against him and, shortly thereafter, was ordered to

---

[11]From July, 2002, through November, 2002, Maxwell was admitted to the Massachusetts Mental Health Partial Hospitalization program because of serious depression that could not be successfully treated on an outpatient basis. His treating psychiatrist's opinion was that Maxwell's "ability to participate in his defense and/or make decisions [was] impaired during this period."

[12]Not only is there nothing in the record to support Hathaway's assertion, the record is entirely inconsistent with her claim.

[13]The record reflects no response by the district attorney's office to this letter.

pay restitution to AIG in an amount exceeding $9,000, the amount of the benefits he had received pursuant to the administrative judge's order of April 30, 2001. The record contains no contemporaneous explanation why Maxwell decided to plead guilty, let alone why he did so at this point in time (it had been more than a year since the last event of any significance noted in the record). However, Maxwell subsequently claimed that his decision was related to his continuing precarious mental condition.

On May 7, 2004 (i.e., slightly more than two years after it heard the matter), the administrative judge of the DIA issued a lengthy, detailed memorandum in which she found Maxwell had suffered a left rotator cuff tear by lifting a 100-pound grate while at work; he had promptly sought medical treatment for the injury; the injury, as well as its cause, was confirmed repeatedly in the medical records AIG had received; Maxwell had attempted to return to work but his injuries had prevented him from doing so; Maxwell had a history of continuous employment before then; Maxwell's homelessness was "directly related to the injury sustained at work"; Maxwell's participation in the Community Work Services program was required by the YMCA homeless shelter; Maxwell had received training in that program and was not "working"; and Maxwell "had no intention of defrauding the insurer."

The administrative judge also found that AIG should have authorized and paid for Maxwell's rotator cuff surgery and that AIG's

> "[f]ailure to provide the employee with reasonable and necessary medical care in the absence of any effort to introduce contrary medical evidence is simply inexcusable. Moreover, had the insurer provided the requisite medical care, the employee might have been able to perform meaningful work."

Finally, she found that AIG's refusal to pay for the rotator cuff surgery placed Maxwell under "extreme stress" that "precipitated a crisis" and impaired his judgment and capacity to think clearly during this period.

Although the administrative judge's rulings regarding the lack of fraud could not have been more clear (indeed, her find-

ings can be fairly characterized as forceful), on March 4, 2005, AIG wrote to the chief probation officer of the Boston Municipal Court Department, asserting Maxwell's failure to pay the restitution that had been part of his plea.

On June 27, 2005, a judge of the District Court allowed Maxwell to withdraw his guilty plea because "the nature of [Maxwell's] ongoing struggle with mental illness may have clouded his judgment as to whether his plea was in his best interests."[14] Subsequently, the Commonwealth, through the Attorney General's Office, filed a nolle prosequi on all counts.

Almost five years had elapsed since Maxwell's injury.

*The underlying case.* Maxwell brought the underlying suit against AIG and Hathaway, asserting claims for malicious prosecution and intentional infliction of emotional distress. The complaint, which is short, in sum alleges that the defendants failed to investigate adequately and did not have sufficient cause to urge criminal charges or pursue civil claims of insurance fraud and larceny. A judge of the Superior Court denied the defendants' special motion to dismiss made pursuant to the anti-SLAPP statute, G. L. c. 231, § 59H. We affirm.

*Discussion.* "We review the judge's decision to grant the special motion to dismiss to determine whether there was an abuse of discretion or error of law." *McLarnon* v. *Jokisch*, 431 Mass. 343, 348 (2000). The motion judge did not err when he found that the defendants had not met their burden of showing that Maxwell's claims are based solely on their petitioning activities. *Duracraft Corp.* v. *Holmes Prods. Corp.*, 427 Mass. at 167-168 (the anti-SLAPP movant has the burden to show that the claims against it are based solely on its petitioning activities and have no other substantial basis). As is clear from the complaint itself, Maxwell's claims are based fundamentally on AIG's inadequate investigation. Neither AIG's internal investigation nor the one conducted by the private investigator AIG hired and directed, was "petitioning" within the meaning of the anti-SLAPP

---

[14]The District Court judge also found that the decision of the administrative judge, while not binding on him, was newly-discovered evidence "of such nature as to its credibility, potency and pertinency to fundamental issues in the case as to be worthy of careful consideration. *Commonwealth* v. *Markham*, 10 Mass. App. Ct. 651, 654 n.1 (1980)."

statute.[15] This alone was sufficient to defeat the defendants' special motion to dismiss. However, in addition, Maxwell's emotional distress claims are based on other nonpetitioning activities, including AIG's efforts to compel Maxwell to relinquish his benefits,[16] and its refusal to pay for required surgery despite the administrative judge's order.

The defendants ask us to ignore the acts mentioned above, arguing that Maxwell's claims rest solely on petitioning activities, namely the defendants' report to the IFB,[17] the urging of criminal charges, and the request to the chief of probation that Maxwell be surrendered. This argument fails for two reasons. First, as noted above, the defendants did not meet their burden of showing that Maxwell's claims rest solely on the defendants' petitioning activity, and the fact that some petitioning activity is implicated is not enough where, as here, the root of the claims (the investigation) is nonpetitioning. See *Garabedian* v. *Westland*, 59 Mass. App. Ct. 427, 432 (2003) (the special movant must show that the "claims are based on the petitioning activi-

[15]"[A] 'party's exercise of its right of petition' shall mean any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body or any other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration; or any other statement falling within constitutional protection of the right to petition government." G. L. c. 231, § 59H, inserted by St. 1994, c. 283, § 1.

[16]The efforts were suspect both because of their timing and their repeated references to the pending criminal charges.

[17]We accept AIG's argument for purposes of this discussion only and without in any way deciding the issue that AIG's report to the IFB constituted petitioning activity within the meaning of G. L. c. 231, § 59H, even though the IFB is not purely a governmental body. The IFB is a statutorily-created entity funded by insurers, but with reporting obligations to the Massachusetts Legislature. St. 1996, c. 427, § 13. In different contexts, it has been found to be "governmental" for various purposes. See *Commonwealth* v. *Harwood*, 432 Mass. 290, 298-299 (2000) (Commonwealth's obligations for proper handling of exculpatory evidence extend to IFB); *United States* v. *Pimental*, 380 F.3d 575, 592-594 (1st Cir. 2004), cert. denied, 543 U.S. 1177 (2005) (IFB employees can be, in certain circumstances, government employees within the meaning of Fed.R.Crim.P. 6[e]).

ties of the movant *alone* and have no substantial basis beyond those activities" [emphasis added]).

Second, even had Maxwell's claims been based solely or substantially on the defendants' petitioning activities, he met his burden of showing[18] that the defendants' exercise of their "right to petition was devoid of any reasonable factual support or any arguable basis in law" and that the defendants' acts caused him actual harm. G. L. c. 231, § 59H. The defendants referred Maxwell's claim as a case of suspected insurance fraud to the IFB based on what can, at best, be characterized as an incomplete investigation into the alleged fraud. AIG's conclusion that Maxwell was "employed" and earning "wages" appears to have been based on nothing more than the private investigator's observation of Maxwell though a window while he mopped and took out the trash at the recruitment center. This was not "reasonable factual support," G. L. c. 231, § 59H, particularly because AIG knew at the time it referred the matter to the IFB that Maxwell was involved in Community Work Services. Moreover, AIG's referral to the IFB was based on its assertion that Community Work Services was a "temp" agency — an assertion that the record shows was flatly incorrect.[19]

Even if AIG's petitioning was not completely "devoid" of all reasonable factual support as of the day it reported the case to the IFB, it certainly became so in June, 2001, when it received documentation directly from Community Work Services showing that Maxwell was in a training program and not employed. The record does not show that AIG submitted this information to the IFB, or that it ever corrected the misstatement it had previously made to the IFB. AIG had this information in hand before the

---

[18]The analysis of a special motion to dismiss under the anti-SLAPP statute is a burden-shifting one: if the movant succeeds in showing that the claims are based solely on protected petitioning, then the burden shifts next to the plaintiff to show, by a preponderance of the evidence, that the petitioning was "devoid of any reasonable factual support or any arguable basis in law" and that it caused actual harm. G. L. c. 231, § 59H. *Duracraft Corp.* v. *Holmes Prods. Corp.*, 427 Mass. at 167-168.

[19]AIG obviously thought Maxwell's involvement with Community Work Services merited further inquiry because it sought — and received — documents from the program. However, it is not evident that AIG inquired further before erroneously reporting to the IFB that Maxwell was working for a temporary employment agency.

IFB referred the matter to the district attorney's office for criminal prosecution.

The defendants' subsequent petitioning, in the form of urging criminal charges and seeking to have Maxwell surrendered on unrelated criminal charges, rested on even fewer facts. The defendants continued to urge enforcement of the restitution order even though they knew that the uncontradicted evidence was that Maxwell had not been employed and had not received wages. They alleged, without any basis, that Maxwell was feigning mental illness and "conveniently" checking himself residentially into McLean Hospital. Nothing but conjecture and cynicism supported this statement, which was the sole basis in turn for requesting that Maxwell be surrendered on unrelated charges so that AIG could stop paying benefits.

Thus, the special motion was properly denied both because the defendants did not meet their initial threshold burden of showing that Maxwell's claims were based solely on their petitioning activities and because, to the extent that their petitioning was implicated in Maxwell's claims, it was devoid of reasonable factual support.

Finally, the motion judge did not err in determining that Hathaway was not exercising her own right of petition but was instead at all times acting on AIG's behalf. The anti-SLAPP statute does not apply unless a party is exercising her own right of petition. See *Kobrin* v. *Gastfriend,* 443 Mass. 327, 332 (2005); *Fisher* v. *Lint,* 69 Mass. App. Ct. 360, 364-365 (2007). Accordingly, the motion was correctly denied with respect to Hathaway.

*Order denying the special motion to dismiss affirmed.*