Leibensperger, Edward P., J.
This action arises from the conduct of Liberty Mutual Fire Insurance Company (“Liberty”) as a workers’ compensation insurer. In the course of that conduct, Liberty took the position that it had obtained assignments from plaintiffs to commence lawsuits against third parties for injuries plaintiffs suffered as a result of a work-related accident. Based on the purported assignments, Liberty commenced lawsuits against three third parties. After learning of the third-party actions, plaintiffs objected to Liberty’s prosecution of the actions. A substantial amount of litigation, including administrative proceedings, ensued between plaintiffs and Liberty before it was finally determined that Liberty had not, in fact, received valid assignments of plaintiffs’ causes of action. Plaintiffs commenced this action alleging that Liberty, as a workers’ compensation insurer, breached its contract with them, as third-party beneficiaries of the insurance contract, by violating applicable Oregon law governing workers’ compensation. Plaintiffs also allege that Liberty engaged in fraud, deceit, civil conspiracy and violations of G.L.c. 93A in its dealings with them. Liberty now moves to dismiss contending that plaintiffs’ claims are based solely on Liberty’s commencement of the third-party actions. Because the commencement of such third-party actions was an exercise of Liberty’s right of petition, Liberty contends that this action should be dismissed pursuant to G.L.c. 231, §59H, popularly known as the “anti-SLAPP” (Strategic Lawsuit Against Public Participation) statute. For the reasons described below, Liberty’s motion will be denied.
BACKGROUND
On August 5, 2008, a helicopter crashed in the mountains of Northern California during a firefighting mission. In the crash, Roark Schwanenberg, the pilot, was killed. His wife, plaintiff, Christine Schwanenberg, is the personal representative of his estate. Also, plaintiff, William H. Coultas, the co-pilot of the helicopter, was severely injured. The crash resulted in eight other deaths and injuries to three additional persons.
At the time of the crash, Mr. Schwanenberg and Mr. Coultas were employed by Carson Helicopters, Inc., a company located in Oregon. Carson had entered into a contract with Liberty to provide workers’ compensation insurance to Carson for its employees. The workers’ compensation insurance was provided pursuant to the Oregon Workers’ Compensation Law. Plaintiffs allege that they are third-party beneficiaries of the contract between Liberty and Carson for workers’ compensation benefits.
As a result of the crash, Liberty paid workers’ compensation benefits to plaintiffs. Death benefits were paid Mrs. Schwanenberg. With respect to Mr. Coultas, benefits were paid directly to him. The payment of benefits by Liberty commenced the direct relationship between Liberty and plaintiffs, as insurer and insureds, under the Oregon statute.
According to plaintiffs, the relationship with Liberty was oppressive from the outset. For example, Mr. Coultas affirms that “before, during and after” the receipt from Liberty of a letter dated October 7, 2008— a key document that will be described in the next paragraph — a Liberty agent was in constant contact with him. Liberty allegedly required Mr. Coultas to have an insurance adjustor attend his medical visits including ones that involved intimate examination of his serious wounds. Mr. Coultas alleges that Liberty, through its agent, knew of the debilitated physical, emotional and psychological state he was in at the time they sent the October 7, 2008 letter, only two months after the crash. Similarly, Mrs. Schwanenberg alleges that she suffered depression and post-traumatic stress arising from her grief upon the tragic loss of her husband. As a result, her ability to make important decisions was still impaired when, only two months after the crash, Liberty sent her the letter dated October 7, 2008 that was essentially the same as the letter sent to Mr. Coultas.
*13 The two letters dated October 7, 2008, hereinafter referred to as the “Letters” or the “Letter,” constituted demands by Liberty that plaintiffs make an election, withing sixty (60) days of receipt of the Letters, whether to bring suit against “a third party” potentially responsible for the crash or to assign that right to Liberty. The Letters did not identify by name any third party or parties.
Oregon Revised Statutes (“ORS”) provide that an insurer “may” compel such an election and prompt action. ORS 656.583. To do so, the insurer must serve the worker with a written demand. ORS 656.583(1). Unless such an election is made within 60 days from receipt or service of such a demand and unless, after making such election, an action against a third party is instituted within such time as is granted by the insurer, the worker is deemed to have assigned the cause of action to the insurer. ORS 656.583(2). The insurer must allow the worker at least 90 days from the making of an election to institute his own action to institute that action. Failure to proceed against the third party operates as an[1] assignment to the insurer of the cause of action, if any, of the worker against the third parly. ORS 656.591.
Liberty decided to initiate the ORS 656.583(1) demand within two months of the crash. It sent the October 7, 2008 Letters by certified mail, return receipt requested. The Letters explained that Liberty’s review of the case indicated that “your injuries may have been caused by the negligence of a third party.” The Letters then explained that under Oregon law, a worker “may be entitled to bring suit against that third party and recover civil damages. Alternatively, you may decide not to pursue that party yourself and assign your right to us.”
The Letters then demanded that Mr. Coultas and Mrs. Schwanenberg “at this time” make a choice. CHOICE A was to indicate by return mail that he/she intended to seek damages against a third party himself or herself. CHOICE B was to indicate that he/she did not intend to seek damages “from the third party” (again, no third party was identified). The Letters stated that if they elected CHOICE B, their rights would be assigned to Liberty to pursue the third party. Liberty advised “[i]f you fail to respond in that time [60 days from receipt of the Letter], your right to pursue the third party will automatically be assigned to us without further option on our part.” If they elected CHOICE A, the Letter said nothing about how long Liberty would allow Mr. Coultas and Mrs. Schwanenberg to institute their own actions.
Mrs. Schwanenberg received the Letter on October 14, 2008. Mr. Coultas received the Letter on October 16, 2008. Mrs. Schwanenberg swears that she placed a checkmark next to CHOICE A and gave the Letter to a family friend to mail to Liberty. Mr. Coultas placed a checkmark next to CHOICE A and mailed the Letter to Liberty. Liberty received Mr. Coultas’s letter, but claims it did not receive Mrs. Schwanenberg’s letter. Liberty, however, never contacted Mrs. Schwanenberg to see if she returned the letter or to ask what her choice was.
Instead, on December 10, 2008, only 56 days after Mrs. Schwanenberg’s receipt of the Letter, Liberty filed an action as the statutory assignee of Mrs. Schwanenberg in the United States District Court for the Eastern District of California. On January 30, 2009, without notice to Mr. Coultas, Liberty filed an action as statutory assignee of Mr. Coultas in the United States District Court for the District of Connecticut on the ground that Mr. Coultas had not commenced his own action "within 90 days of making his election. In both actions (the “Lawsuits”), Liberty named Sikorsky Aircraft Corporation, General Electric Company and Columbia Helicopters, Inc. as defendants. Because Liberty discovered it was an insurer of Columbia Helicopters, it voluntarily dismissed its claims against Columbia Helicopters in both Lawsuits, shortly after filing.
Unaware that Liberty had filed the Lawsuits against third parties, Mrs. Schwanenberg and Mr. Coultas engaged counsel in early 2009 to pursue third-party actions on their own behalf. In late March 2009, plaintiffs’ counsel discovered that Liberty had filed the Lawsuits. By letter to Liberty dated March 26, 2009, plaintiffs’ counsel objected to Liberty’s prosecution of the Lawsuits and rescinded any purported assignment of plaintiffs’ claims to Liberty. Liberty rejected plaintiffs’ demands. Plaintiffs successfully moved to intervene in the Lawsuits. For the next two years, plaintiffs and Liberty engaged in heated battles in federal court over who had the right to proceed with the Lawsuits. In that period, plaintiffs also filed their own action against third parties potentially responsible for the crash in state court in Oregon.
On October 5, 2010, plaintiffs filed petitions with the Oregon Workers’ Compensation Board for a determination of the validity of the purported assignments of their rights to Liberty. The Board conducted a hearing. On April 8, 2011, the Board issued rulings on the petitions. With respect to Mrs. Schwanenberg, the Board found that Liberty’s October 7, 2008 Letter “contained misrepresentations and omissions that individually and collectively, rendered its written demand inadequate.” In addition, the Board found that Liberty failed to inform plaintiffs that it insured a potentially responsible third party (Columbia Helicopters) and that such failure was a material misrepresentation by omission that would render any claimed assignment revocable. With regard to Mr. Coultas, the Board found that Liberty’s October 7, 2008 Letter failed to inform Mr. Coultas that he had at least 90 days to commence suit on his own. Absent that disclosure, Mr. Coultas, as a matter of law, had the entire period provided by the two-year statute of limitations to make an election. Thus, the purported assignment *14 of Mr. Coultas’s rights in January 2009, was ineffective. The Board’s decisions invalidated the putative assignments of both plaintiffs’ rights to Liberty.
Liberty did not appeal the Board’s decision with respect to Mr. Coultas. With respect to the Board’s decision invalidating any assignment by Mrs. Schwanenberg, Liberty appealed to the Oregon Court of Appeals. On August 8, 2012, the Court of Appeals affirmed the Board’s decision. The Court of Appeals found that Liberty’s failure to inform plaintiff, prior to demanding in the Letter that she make an election, that it insured Columbia Helicopters was a material omission that entitled Mrs. Schwanenberg to revoke any claimed assignment. Because that determination of her right to revoke was dispositive of the appeal, the Court did not address whether the Letter otherwise satisfied the requirements of ORS 656.583.
Following the Board’s decision with respect to Mr. Coultas in April 2011, and after more litigation skirmishing between Mr. Coultas and Liberty, the Lawsuit initiated by Liberty as assignee of Mr. Coultas was finally dismissed in April 2012 (effective in June 2012). Following the decision by the Oregon Court of Appeals with respect to Mrs. Schwanenberg in August 2012, Liberty’s Lawsuit for the death of Mr. Schwanenberg was dismissed on September 20, 2012. Meanwhile, plaintiffs’ state court action against third parties responsible for the crash proceeded. On March 27,2012, a jury awarded damages to plaintiffs against General Electric in the amount of $42 million for Mr. and Mrs. Coultas and $28,455,000 for the estate of Mr. Schwanenberg. Those damage awards were later reduced to $23,940,000 for Mr. and Mrs. Coultas and $1,329,350 for the estate. The judgment is on appeal.
DISCUSSION
A. Standard
The anti-SLAPP statute, G.L.c. 231, §59H, was enacted by the Legislature to provide a quick remedy for those citizens targeted by frivolous lawsuits based on their government petitioning activities. Kobrin v. Gastfriend, 443 Mass. 327, 331 (2005). Under the statute, as interpreted by the Supreme Judicial Court in Duracraft Corporation v. Holmes Products Corp., 427 Mass. 156 (1998), if a claim against a party is based solely on said party’s exercise of its right of petition under the Constitution of the United States or of the Commonwealth, said party may bring a special motion to dismiss. Such a motion is considered under a burden shifting analysis. “The special movant who ‘asserts’ protection for its petitioning activities would have to make a threshold showing through the pleadings and affidavits that the claims against it are ’’based on" the petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities." Id. at 167-68. If such a showing is made by the moving party, the burden shifts to the non-moving party to show “(1) the moving party’s exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and (2) the moving party’s acts caused actual injury to the responding party.” G.L.c. 231, §59H. The statute makes clear that the exercise of a party’s right of petition includes statements made to a judicial body. Id.
The Supreme Judicial Court notes that the antiSLAPP statute “had its genesis as a legislative attempt to protect private citizens when exercising their constitutional right to speak out against development projects or other matters of concern to them and their communities and to seek government relief.” Kobrin, supra at 337. “SLAPP suits [are] ‘generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them from doing so.” Duracraft, supra at 161. While that description hardly fits a suit by individual insureds against an insurer that pursues litigation to advance its own pecuniary interest, the Court also has found that the language of the statute is broader than that prototype. See Baker v. Parsons, 434 Mass. 543, 549 (2001) (the legislative history indicates that the anti-SLAPP statute was intended to go beyond the “typical” case). That said, however, the Court imposed a significant, narrowing construction of the statute in order to avoid constitutional problems. A moving party must demonstrate that the nonmoving party’s complaint has no substantial basis “other than or in addition to the [moving party’s] petitioning activity.” Duracraft, supra at 167-68. “We reasoned that an over-broad construction of the anti-SLAPP statute would compromise the nonmoving party’s right to petition — the same right the statute was enacted to protect.” Kobrin, supra at 335.
B. Analysis
The threshold question presented is whether Liberty can demonstrate that plaintiffs’ claims in this action are based solely on Liberty’s petitioning activities — the filing of the third-party Lawsuits. Liberty contends that “each and every allegedly bad act underlying the five different causes of action in the Amended Complaint stems directly from, and was undertaken in connection with, Liberty Mutual’s protected petitioning activity.” Liberty Memorandum, p. 20. As described below, Liberty is misfocused on what contributed to plaintiffs’ harm (the filing of the Lawsuits) rather than what is the crux of plaintiffs’ claims of wrongdoing.
The seminal case of Duracraft, supra, provides the structure for analysis. The moving party in Duracraft, like Liberty here, argued that the complaint of the nonmoving party (Duracraft) was based upon protected petitioning activity — in Duracraft, testimony in a deposition by an agent of the moving party (Homes Products Corp.). The harm alleged by Duracraft flowed *15 both from the deposition testimony and by the agent’s pre-testimony discussion between the agent and Holmes. The Court found that the alleged breach of preexisting legal obligations between the agent and Duracraft gave Duracraft a substantial basis for its complaint other than, and in addition to, the deposition testimony alone. Duracraft, supra at 168. Thus, while the protected activity (deposition testimony) was alleged to be a cause of harm, the underlying breach of contract and unfair competition claims were the crux of Duracrafts complaint. That defeated the antiSLAPP motion.
Factually analogous is Maxwell v. AIG Domestic Claims, Inc., 72 Mass.App.Ct. 685 (2008). There, a workers’ compensation insurer attempted to use the anti-SLAPP statute against a complaint by a worker that the insurer breached its obligations to him as an insured. The insurer had reported the worker to an insurance fraud bureau for pursuing a fraudulent workers’ compensation claim. The insurer asserted that the report was protected petitioning activity and that the worker’s subsequent lawsuit was based on the petitioning activity. The Appeals Court affirmed the denial of the insurer’s antiSLAPP motion holding that . the fact that some petitioning activity is implicated is not enough where, as here, the root of the claims (the investigation) is nonpetitioning." Id. at 695. Because there was a preexisting legal relationship between the parties, and the worker’s claim arose from the insurer’s failure adequately to investigate a claim as it was obligated to do under its relationship with the worker, the worker’s lawsuit was not based solely on the insurer’s petitioning activity. This was true even though the petitioning activity, the report to the insurance fraud bureau, appeared as the principal cause of the harm alleged by the worker.
Finally, Keystone Freight Corp. v. Bartlett Consolidated, Inc., 77 Mass.App.Ct. 304 (2010), provides additional support for the analysis. The anti-SLAPP moving party contended that the plaintiffs complaint for abuse of process, deceit, negligence and c.93A violations was based on the moving party’s previous collection lawsuit. The Appeals Court held that plaintiffs claims were based on the overall conduct of the moving party with respect to its billing and collecting practices “both prior to and subsequent to the commencement of Bartlett’s collection action ...” Id. at 315. Those practices were sufficiently “in addition to” Bartlett’s petitioning activity to defeat the antiSLAPP motion. Moreover, the plaintiffs claims of misconduct in billing practices “were not based solely on Barlett’s petitioning activity but were ”in response to" the petitioning activity . . ." Id. at 316. The holding in Keystone reinforces the conclusion that merely because petitioning activity is one aspect of a defendant’s alleged misconduct — even if it is an aspect that is the principal cause of harm to a plaintiff — the claims are not subject to dismissal under the anti-SLAPP statute if there are other, or additional, grounds for a plaintiff s complaint.
Application of the principles outlined in Duracraft, Maxwell and Keystone prescribes the result in the present case.[1] The claims of Mrs. Schwanenberg and Mr. Coultas are based on Liberty’s overall conduct as a workers’ compensation insurer, of which only one aspect was the filing of the Lawsuits. The key event that launched the allegedly wrongful conduct by Liberty was the October 7, 2008 Letters to plaintiffs. That correspondence was not protected petitioning activity. Instead, the Letters were sent by Liberty in the course of operating its business under the laws governing its obligations as a workers’ compensation insurer in Oregon. Plaintiffs allege, and the record contains findings by the Oregon Workers’ Compensation Board and the Oregon Court of Appeals, that the Letters were misleading and contained material omissions. The crux of plaintiffs’ complaint is that Liberty, starting with the Letters and its related conduct of pressuring plaintiffs with respect to making an important decision so soon after suffering severe and debilitating injuries, violated its obligations as a workers’ compensation insurer, was deceitful and committed an unfair insurance practice. That conduct allegedly caused plaintiffs harm before and after the filings by Liberty of the Lawsuits. Plaintiffs claim emotional distress damages, for example, as a result of receiving the Letters, learning about the Lawsuits and litigating with Liberty after they asserted that no valid assignments had occurred. Plaintiffs also assert that Liberty’s conduct throughout, starting with the Letters, was unfair and deceptive under c. 93A. At bare minimum, that claim, with respect to the Letters (concededly nonpetitioning activity by Liberty), could entitle plaintiffs to nominal damages.
All of Liberty’s allegedly actionable conduct arose from the preexisting legal relationship between Liberty and plaintiffs, with the filing of the Lawsuits being only one act of several. As in Maxwell, supra at 695, the fact that petitioning activity was implicated in the course of conduct is not enough where the root of plaintiffs’ claims is based on Liberty’s nonpetitioning conduct. Here, that nonpetitioning conduct was Liberty’s performance and practice as a workers’ compensation insurer.
CONCLUSION
For the reasons described above, Liberty’s special anti-SLAPP motion to dismiss is DENIED.

Office One, Inc. v. Lopez, 437 Mass. 113 (2002), relied upon by Liberty, is not to the contrary. There, “all of the conduct alleged as unlawful falls within the broad definition of petitioning activity . . .” Id. at 123.