PATRICIA S. KELLEY vs. THE STOP & SHOP COMPANIES, INC.

No. 87-1085.

Suffolk.   May 9, 1988. — November 16, 1988.

Present: GREANEY, C.J., SMITH, & WARNER, JJ.

*Abuse of Process. Practice, Civil,* Instructions to jury, Verdict.

Sufficient evidence was introduced at the trial of a claim of abuse of process
    to warrant an instruction to the jury on the plaintiff's theory that the
    defendant, her employer, filed an application for a criminal complaint
    with the ulterior purpose of interfering with the plaintiff's grievance
    proceedings. [562-563]
There was no error at the trial of a claim for abuse of process in the judge's
    admission of evidence of the plaintiff's lost income as an element of
    damages. [563]

CIVIL ACTION commenced in the Superior Court Department
on November 20, 1984.

The case was tried before *William C. O'Neil, Jr.,* J.

*Geoffrey D. Wyler (Dorothy M. Linsner* with him) for the
defendant.

*Mark E. Schreiber* for the plaintiff.

SMITH, J.   Patricia S. Kelley (plaintiff) and her husband[1]
brought a complaint in the Superior Court against The Stop &
Shop Companies, Inc. (Stop & Shop), seeking damages for,
among other things, abuse of process, claiming that the defend-
ant had improperly filed an application for a criminal complaint
against the plaintiff for larceny of merchandise. Later, the
plaintiff filed an amended complaint that added a count alleging
a violation by the defendant of her civil rights. See G. L.
c. 12, § 11I. A jury returned verdicts in favor of the plaintiff

---

[1] The plaintiff's husband claimed damages for loss of consortium. A
judgment was returned against him and he has not appealed that verdict.
The word "plaintiff" in the opinion, therefore, describes Mrs. Kelley.

on both her abuse of process ($36,000) and civil rights ($1.00) claims. The defendant does not contest the verdict on the plaintiff's civil rights count but argues that the judge committed error during the trial of the plaintiff's abuse of process claim.

"To prevail on an abuse of process claim 'it must appear that the process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed.' . . . . The essential elements of the tort are '(1) "process" was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage.'" *Datacomm Interface, Inc.* v. *Computerworld, Inc.*, 396 Mass. 760, 775-776 (1986) (citations omitted). "[I]t is immaterial that the process was properly issued, that it was obtained in the course of proceedings that were brought with probable cause and for a proper purpose, or even that the proceedings terminated in favor of the person instituting or initiating them. The subsequent misuse of the process, though properly obtained, constitutes the misconduct for which the liability is imposed . . . ." Restatement (Second) of Torts § 682 comment a (1977). Also see *Quaranto* v. *Silverman*, 345 Mass. 423, 426 (1963).

It was the plaintiff's theory at trial that the defendant used legal process (the application for a criminal complaint) to accomplish at least one of two ulterior purposes for which that process had not been designed or intended. Those ulterior purposes were: (1) to coerce the plaintiff into paying $96.09 to the defendant, or (2) to place the plaintiff at a disadvantage in her employee grievance proceedings against the defendant in order that her grievance would be decided against her. The judge, over the defendant's objection, instructed the jury that they could find the defendant liable if the plaintiff proved that the defendant had used legal process for either of the two alleged ulterior purposes.

The defendant concedes, on appeal, that the plaintiff introduced sufficient evidence to have the jury instructed on the question whether it filed an application for a criminal complaint with the intention of coercing the plaintiff to pay $96.09 to it. It argues, however, that the plaintiff did not introduce any

evidence on her claim that the defendant filed the application for a criminal complaint for the ulterior purpose of interfering with her grievance proceedings and, therefore, the instruction on that theory was incorrect.

Where a jury are instructed that they can find a defendant liable on either of two theories, and insufficient evidence is introduced as to one of those theories, the defendant is entitled to a new trial if it cannot be determined whether the verdict was based on the incorrect instruction. See *Womble* v. *Dubuque Fire & Marine Ins. Co.*, 310 Mass. 142, 148-149 (1941); *Friese* v. *Boston Consol. Gas. Co.*, 324 Mass. 623, 630-631 (1949); *Slate* v. *Bethlehem Steel Corp.*, 400 Mass. 378, 384 (1987); *McInnis* v. *Tewksbury*, 19 Mass. App. Ct. 310, 314 (1985). Here, it is impossible to know from the verdict on which ground the jury based its decision. Therefore, we must examine the evidence to determine if sufficient evidence was introduced at trial to warrant the grievance interference instruction. "Viewing the evidence in the light most favorable to the plaintiffs, *Uloth* v. *City Tank Corp.*, [376 Mass. 874,] 876 [(1978)], we must determine whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.' " *Slate* v. *Bethlehem Steel Corp.*, 400 Mass. at 382-383, quoting from *MacDonald* v. *Ortho Pharmaceutical Corp.*, 394 Mass. 131, 140-141, cert. denied, 474 U.S. 920 (1985).

The plaintiff started working for the defendant in February, 1967. On July 13, 1983, she was working in the defendant's store in Lexington as a full-time cash office clerk. That day, she decided to purchase two director's chairs which were on sale at the store for $7.88 each. She rang in a purchase for the two chairs and placed $16.55 (2 x $7.88 plus tax) in the register.[2] She then placed the receipt for the chairs and her car

---

[2] At that time the defendant had a rule that prohibited employees from ringing in their own purchases. Enforcement of that policy appeared to be lax and the plaintiff and other employees had frequently rung in their own purchases. Such purchases had been observed by the manager, without consequence.

keys on the service counter and instructed one Workman, a part-time cashier, to take the chairs and put them in her automobile.

Later that day, at the request of her sister, the plaintiff purchased four director's chairs for her. She took $35.00 and her car keys from her pocketbook and placed them on the service desk. She saw Workman place the four chairs in a carriage and remove them from the store. On many occasions employees had left money and car keys on the service desk to pay for goods the employee had purchased or for another employee to make a purchase for them and place the merchandise in the employee's automobile.

On July 19, 1983, Quinn, the store manager, summoned the plaintiff to his office. One Parnell, a security agent for the defendant, was also there. Quinn had known the plaintiff for several years and had no reason to doubt her honesty prior to July 13. Parnell informed the plaintiff that an investigation was being conducted concerning the director's chairs which had been placed in her automobile on July 13, 1983. Quinn informed the plaintiff that he had reviewed the cash register tape for all registers for that day, and could not find a record of payment for those director's chairs. She told the two men that she had rung in the first two chairs herself and Workman had rung in the four additional chairs. The plaintiff stated that she had paid $7.88 for each chair.

Quinn then told the plaintiff that the price of the chairs was $17.88 each. The plaintiff informed Quinn that the chairs were, in fact, marked $7.88 and that was the price she had paid. Parnell then located an amount equal to two chairs at $7.88 plus tax on a cash register tape but was unable to locate a figure corresponding to the purchase of the four additional chairs at $7.88.[3] The plaintiff suggested that the two men talk to Workman who would confirm her story. After speaking with Workman, Parnell called the plaintiff back into the office.

---

[3] The register tape did show that Workman had rung in a purchase on July 13 for $33.24 for which he had been given $35.00. Four chairs at $7.88 plus tax, when rung up correctly would total $33.10. There was evidence that Workman had a history of ringing in purchases incorrectly.

He told the plaintiff that Workman denied that there was money on the counter with the plaintiff's car keys and also denied ringing in the four chairs. Parnell informed the plaintiff, "You can resign and we can settle this here and now or we can go to court." The plaintiff informed the two men that she felt threatened and was not able to make a decision without having some time. She then left the office. Quinn later told her that she was "suspended pending termination."

The evidence, viewed in the light most favorable to the plaintiff, supports the following chronology:

July 20, 1983 - 10:00 P.M. — the plaintiff spoke to the union business agent and discussed with him the filing of a grievance against the defendant;

July 21, 1983 - 10:00 A.M. — the plaintiff received a telephone call from the business agent who informed her that he had set up a "first step grievance meeting" with Quinn for the following day;

July 21, 1983 - sometime in the afternoon - Quinn and Parnell appeared at the clerk's office of the Concord District Court and filed the application for a criminal complaint.[4] Quinn signed the application.[5]

On July 22, the plaintiff received a notice, dated July 21, informing her that the defendant had filed an application for a criminal complaint against her. A hearing was scheduled for

---

[4]The defendant contends that there was no evidence that showed that Quinn and Parnell went to the clerk's office on July 21 to file the application. Rather, it claims that the uncontradicted evidence demonstrated that the two men went to the clerk's office on July 20 and filed the application. Therefore, the defendant argues that the application was filed before Quinn had learned that the plaintiff intended to file a grievance.

Although Parnell testified that he and Quinn went to the clerk's office on July 20 to file the application, he also testified they went there "two days" after meeting with the plaintiff. There was evidence from the plaintiff and Quinn that the meeting referred to by Parnell was on July 19.

Viewing the evidence in the light most favorable to the plaintiff, a jury might reasonably draw the inference that the two men went to the clerk's office on July 21.

[5]At the time that Quinn signed the application he was aware of the defendant's policy that a store manager must exercise "extreme caution" before seeking a criminal complaint against an employee for larceny.

August 1. On that date, the plaintiff appeared at the clerk's office. During the hearing, the plaintiff decided to pay the defendant $96.06 in exchange for the defendant's agreement to terminate the criminal proceedings.[6] Her reason to pay the money was to avoid the humiliation and embarrassment of an ongoing criminal proceeding.

The plaintiff continued with her grievance against the defendant. On August 16, she attended a third-step grievance hearing. One Mehan, defendant's manager of labor relations, stated that since the plaintiff had paid the $96.09 in court to resolve the criminal proceedings against her, she must have been guilty of larceny. The plaintiff denied Mehan's accusation. At the conclusion of the third-step grievance hearing, the defendant upheld the plaintiff's suspension pending arbitration. The union refused to take the plaintiff's grievance to binding arbitration. One factor in its decision was the manner in which the plaintiff resolved the proceedings in the Concord District Court.

Subsequently, at a conference at the Massachusetts Commission Against Discrimination on May 10, 1984, the defendant's manager of human resources development stated that the plaintiff was terminated for "violating company policy, we never said she stole anything, all we said was she made a mistake." Parnell stated at the same conference that his "job was loss prevention, his job was to make sure that he got the ninety-six dollars and nine cents, and he decided to use the criminal process, the court system, to get that money rather than to pursue [the plaintiff] for the money."

The evidence supported an instruction to the jury that the defendant could be held liable if the jury found that it filed the application for a criminal complaint with the ulterior purpose of interfering with the plaintiff's grievance proceedings. The plaintiff, a long-time employee of the defendant, was known to the store manager as an honest person prior to the July 13th incident. At the initial meeting between the plaintiff

---

[6] The $96.09 figure is based on the amount the chairs were supposed to be marked ($17.88), times six, plus five percent tax, minus $16.55, the amount the defendant acknowledges that the plaintiff paid for the first two chairs.

and Parnell and Quinn, Parnell attempted to dispense with the plaintiff's grievance rights altogether by threatening her with court action if she did not resign immediately. The defendant filed its application for a complaint shortly after it had received word from the union representative that the plaintiff had filed a grievance. The application was filed prior to the first step of the grievance procedure. The speed and timing with which the application was filed, in view of the company's policy that store managers exercise "extreme caution" in filing such applications against employees, coupled with the plaintiff's long-standing excellent employment record with the defendant, warranted the judge's instruction on the plaintiff's grievance interference theory.[7]

The defendant also claimed that the judge committed error in admitting evidence of the plaintiff's lost income. We have examined the record and conclude there was no error.

There is no merit to the plaintiff's claim that the single justice of this court abused her discretion in allowing the defendant's late filing of its notice of appeal.

*Judgments affirmed.*

---

[7] The defendant also raised as issues the denials of its motions for a directed verdict and for judgment notwithstanding the verdict. Those motions were based on the same ground as the defendant's motion for a new trial, that is, that the plaintiff failed to introduce any evidence to warrant submission to the jury on her claim that the defendant filed the application with the ulterior purpose of interfering with her grievance proceedings. Because the plaintiff did introduce sufficient evidence on that theory, there was no error in the denials of those motions.