KEYSTONE FREIGHT CORP. *vs.* BARTLETT CONSOLIDATED, INC.

No. 09-P-141.

Norfolk. October 6, 2009. - August 2, 2010.

Present: LENK, GREEN, & TRAINOR, JJ.

*Practice, Civil,* Motion to dismiss, Counterclaim and cross-claim. *"Anti-SLAPP" Statute. Abuse of Process.*

In a civil action asserting claims of abuse of process, deceit, negligent misrepresentation, and a violation of G. L. c. 93A, alleged to have arisen from a prior action (involving a disputed debt) that was brought by the defendant against the plaintiff, a Superior Court judge properly allowed the defendant's motion to dismiss, where the plaintiff's claims constituted compulsory counterclaims that should have been adjudicated in the prior litigation. [309-311]

In a civil action asserting, inter alia, abuse of process alleged to have arisen from a prior action (involving a disputed debt) that was brought by the defendant against the plaintiff, a Superior Court judge properly denied the defendant's special motion to dismiss pursuant to the "anti-SLAPP" statute, G. L. c. 231, § 59H, where the plaintiff's abuse of process claim (as well as the other, related claims) was not predicated solely on the defendant's filing of the prior collection action, but rather was also predicated on the defendant's administrative misconduct prior to and subsequent to filing that prior action. [311-317]

CIVIL ACTION commenced in the Superior Court Department on March 26, 2008.

A motion to dismiss and a special motion to dismiss were heard by *John P. Connor, Jr.,* J.

*Stephen W. Sutton* for the plaintiff.

*Joseph E. Kelleher, III,* for the defendant.

TRAINOR, J. Keystone Freight Corporation (Keystone) filed a complaint in Superior Court alleging that Bartlett Consolidated, Inc. (Bartlett), was liable for an abuse of process, deceit, negligent misrepresentation, and a violation of G. L. c. 93A. In response, Bartlett filed a motion to dismiss alleging that the claims were

compulsory counterclaims that Keystone was required to plead in a prior collection action that Bartlett had brought against Keystone. Bartlett also filed a special motion to dismiss pursuant to G. L. c. 231, § 59H (the "anti-SLAPP" statute), arguing that Keystone's suit was in retaliation for Bartlett's collection action.

In his memorandum of decision on both motions, the judge determined that Keystone's action constituted compulsory counterclaims in the earlier law suit brought by Bartlett. The judge also denied Bartlett's special motion to dismiss pursuant to § 59H. Both parties appealed. This appeal poses the questions whether allegations arising from the prior litigation must be pleaded as compulsory counterclaims, and whether an abuse of process and other related claims can survive a motion to dismiss pursuant to the anti-SLAPP statute. We have determined that the judge did not err, and affirm the order and judgment.

*Background.* On April 4, 2005, Jeremy Petrosso was a truck driver for Keystone, a freight company. On that afternoon, Petrosso collided with a guardrail on the westbound side of Route 2 in Fitchburg, while attempting to avoid hitting an animal in the road. The force of the collision caused the truck to straddle and run over a portion of the guardrail. A passerby informed Trooper Stephen McDonald, who was working a detail nearby, of the accident. When he reached the accident site, McDonald observed "a few yards of curled up guardrail just pulled up." After determining that there were no injuries, McDonald guided Petrosso off the guardrail and directed him toward a side street to wait for the investigating officer.

Trooper Jeanne Gannon received a report of the accident while at the Leominster barracks. She responded and reached the accident scene within minutes. She took a statement from Petrosso and issued him a citation for a marked lane violation because he failed to control his vehicle and keep it on the road. She also conferred with McDonald about what he observed, but did not measure the damaged guardrail until the following day, April 5, 2005. By her measurement, the accident caused approximately 200 feet of guardrail to be torn up from the ground and flattened.

On the day of the accident, Gannon reported the damage in a log kept at the barracks with the on-duty desk officer. That dam-

age report was in turn reported to the Massachusetts Highway Department (department). An employee from the department went to the accident scene and completed a form titled, "SCOPE OF WORK TO BE PERFORMED TO REPAIR INSURED DAMAGE TO HIGHWAY APPURTANCES" (scope of repair form), based upon his observations.[1] Bartlett, a private contractor, was next on the rotating list of companies prequalified under the department's accident recovery program to repair the guardrail. The department contacted Bartlett, requested that it repair the guardrail, and provided Bartlett with the scope of repair form. Bartlett made the necessary repairs and, in lieu of direct payment, the department assigned whatever claim it might have against Keystone to Bartlett.

Bartlett forwarded to Keystone an invoice for $23,762.72 for the repairs. The invoice characterized twenty-seven percent of the amount owed as representing overhead, nine percent as profit, and an additional $1,500 of the total as an emergency response fee. Keystone, unhappy with the amount, engaged Custard Insurance Adjusters, Inc. (Custard), to investigate the accident and review the invoice. Preliminarily, Custard opined that the invoice amount was outside the range of fair market value for the amount of repairs completed by Bartlett.

Custard conducted a site inspection, with a Bartlett employee in attendance. Through this inspection Custard observed that significant alterations had recently been made to the entire scene, consisting of additions in the length of refurbished guardrail and requiring equipment in addition to the equipment needed to repair the guardrail in the original claim. As a result of these alterations, Custard had difficulty accurately evaluating the actual cost of the claimed repair work.

Having been informed of these difficulties, Keystone communicated Custard's conclusions to Bartlett and requested supporting documentation from Bartlett for its claim. Keystone specifically requested documentation supporting the amount of the overhead, the profit, and the emergency fee charged. In essence, Keystone inquired why Bartlett charged twice the amount that Custard determined that the repair job would cost on the

---

[1] In bold, hand-written lettering, the department's employee wrote "EMERGENCY" along the top of the form.

open market. In response to Custard's observations and opinion, and Keystone's inquiries concerning the bill, Bartlett filed a small claims action in the District Court seeking the full invoice amount of $23,762.72, plus court costs.

Soon thereafter, Bartlett sent correspondence to Custard that offered to reduce the bill to $21,877. The new figure represented a reduction of approximately eight percent from the original figure. As a result of its market research, however, Custard had determined that the value of Bartlett's repair work was $12,909.15.[2] In addition, Bartlett's settlement offer remained seventy percent higher than Custard's estimated repair value. Custard had reached this amount by assuming that the linear measurement of damage had been accurately asserted by Bartlett, and that such emergency repairs should have cost thirty dollars per foot.[3] Keystone rejected Bartlett's settlement offer.

Keystone sought to remove the small claims action to the District Court civil docket and made a demand for a jury trial. The District Court judge allowed that motion. Keystone served Bartlett with various document requests, including photographs, receipts, invoices, payroll records, and time sheets for Bartlett employees and for the relevant police detail. The photographs provided by Bartlett in response were inconsistent with the collision having caused hundreds of linear feet of damage. The invoices from Bartlett's supplier totaled $3,237.77 for the materials required to complete the repairs.

In March of 2007, the parties filed a joint pretrial memorandum, in which Keystone advanced alternative theories in its defense: first, that Petrosso was not negligent in hitting the guardrail because he swerved to avoid hitting an animal in the road; second, that Bartlett misrepresented the extent of the damage caused by the accident, misrepresented that the damage resulting from the accident resulted in an "emergency response," and grossly overstated the cost of repairs.

---

[2]In an attempt to substantiate a settlement figure that, on its face, still appeared above market, Bartlett attached estimates from competitors for some of the same work completed by Bartlett. Those estimates, however, appear to undermine Bartlett's arguments, as they reflect a lower cost for the repairs.

[3]This amount excludes the cost of one "ET-2000 Plus guardrail end treatment system," the overhead value, and other minor associated costs.

In late 2007, during discovery, the parties deposed nine individuals. As discovery progressed, Keystone amassed more evidence indicating that Bartlett had employed fraudulent billing practices when it generated Keystone's invoice. First, during the deposition of Trooper Gannon, it came to light that the guardrail remained in a damaged state a full day after the April 4, 2005, accident. Gannon deposed to the fact that she measured the damaged guardrail on April 5, 2005. This evidence was in direct contradiction to Bartlett's allegation that it had a crew work overnight to complete the repairs in immediate response to the accident, and shed doubt on the propriety of its charging Keystone a $1,500 emergency response charge.[4] Second, at the deposition of Bruce Willens, an employee of the department, Keystone learned that it was the department's policy to allow ten percent for overhead and ten percent for profit when it paid prequalified contractors directly, in contrast to the twenty-seven percent for overhead and nine percent for profit Bartlett charged Keystone.

Keystone filed a motion to amend its answer and file a counterclaim against Bartlett pursuant to G. L. c. 93A, § 11. Bartlett opposed that motion, arguing that Keystone's delay in bringing the motion caused it prejudice,[5] and that Keystone's c. 93A claim, even if timely brought, should be dismissed under the anti-SLAPP statute. The District Court judge denied Keystone's motion. After trial on January 16, 2008, the jury returned a

---

[4]According to the "accident recovery program procedures" promulgated by the department, a prequalified contractor must complete emergency work according to three levels of response time:

> "1) *Immediate Response:* An exceptionally hazardous condition not to exceed four (4) hours in response time.

> "2) *Direct Response:* hazardous condition responded to within four (4) to twelve (12) hours.

> "3) *Normal Response:* condition responded to within twelve (12) to twenty-four (24) hours."

In the deposition testimony of Bruce Willens, an accident recovery supervisor employed by the department in the district relevant to this case, he attested to his district's practice of treating all emergency calls as requiring immediate response and his understanding that the repair job at issue in this appeal as having required an immediate response.

[5]That it had not conducted discovery as if it were defending a counterclaim.

verdict finding Petrosso not negligent and, therefore, Keystone not liable to Bartlett for the cost of the repairs. Judgment entered in that action on January 28, 2008.

After obtaining a favorable verdict and judgment in the District Court, Keystone filed a four-count complaint in Superior Court, alleging abuse of process, negligent misrepresentation, deceit, and violation of G. L. c. 93A, § 2, pursuant to G. L. c. 93A, § 11. Bartlett responded by filing a motion to dismiss on May 27, 2008, pursuant to Mass.R.Civ.P. 12(b)(6), 365 Mass. 754 (1974), arguing (a) that Keystone's complaint contained only claims that were compulsory counterclaims in the District Court action under Mass.R.Civ.P. 13(a), as amended, 423 Mass. 1405 (1996); (b) that Keystone's claims were precluded by the doctrine of res judicata; and (c) that Keystone otherwise failed to state a claim upon which relief can be granted. On that same date, Bartlett also filed a special motion to dismiss pursuant to G. L. c. 231, § 59H. Keystone filed its opposition to those motions, with accompanying memoranda, on that date as well.

The Superior Court judge allowed Bartlett's motion to dismiss pursuant to rule 12(b), denied its special motion to dismiss pursuant to § 59H, and entered a judgment of dismissal against Keystone. In his memorandum and order on both motions, the judge agreed with Bartlett that Keystone's complaint consisted of compulsory counterclaims in the prior lawsuit, but disagreed with Bartlett insofar as it asserted that Keystone's suit concerned Bartlett's petitioning activities alone. Keystone filed a notice of appeal, challenging the rule 12(b)(6) dismissal, and Bartlett filed a cross-appeal contesting the denial of its § 59H special motion to dismiss.

*Keystone's appeal.* Rule 13(a) requires that "[a] pleading shall state as a counterclaim any claim for relief the court has power to give which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . ." The rule embodies the principle that "[a]ll claims arising out of the same facts should be heard, where possible, in the same proceeding." *Columbia Chiropractic Group, Inc.* v. *Trust Ins. Co.*, 430 Mass. 60, 63 (1999). Thus, "failure to plead a compulsory counterclaim bars a party from

bringing a later independent action on that claim." *Mancuso* v. *Kinchla,* 60 Mass. App. Ct. 558, 563 (2004). See *National Lumber Co.* v. *Canton Inst. for Sav.,* 56 Mass. App. Ct. 186, 187 (2002) (same).

To be compulsory, a counterclaim need not rest on precisely identical facts or pose identical allegations. *Mancuso, supra.* In fact, "[f]or purposes of determining whether a counterclaim is compulsory or permissive, the word 'transaction' 'should not be construed narrowly or technically, but should be construed in a sense to effectuate the settlement in one proceeding of controversies *so closely connected* as appropriately to be combined in one trial in order to prevent duplication of testimony, to avoid unnecessary expense to the parties and to the public, and to expedite the adjudication of suits' " (emphasis in original). *National Lumber, supra* at 188, quoting from *Volpe Constr. Co.* v. *Trustees of Tufts College,* 1 Mass. App. Ct. 38, 40 (1973). In short, "there [must be] such a 'logical relationship' between . . . [Keystone's] claims and [Bartlett's original] claim . . . that the former clearly should have been added as compulsory counterclaims to [Keystone's] answer. . ." *Mancuso, supra.*

Here, the prior litigation consisted of an attempt by Bartlett to collect its debt as assignee from the Commonwealth. Keystone's subsequent complaint concerned Bartlett's billing practices in reaching a figure for that debt. In defending the original claim, Keystone not only denied liability for the debt, but also raised the impropriety of those billing practices as a defense. See *PGR Mgt. Co., Heath Props.* v. *Credle,* 427 Mass. 636, 639 (1998) (opining "[d]efenses and compulsory counterclaims are part and parcel of the underlying case and are adjudicated as part of that case"). Keystone also attempted, unsuccessfully, to amend its answer to add a counterclaim identical to count IV of its complaint.

There can be little question that those claims should have been adjudicated in the prior lawsuit. The judgment of dismissal must stand because "[p]rinciples of judicial economy, as well as the avoidance of inconsistent results, suggest that all claims [relating to the disputed debt should have] be[en] joined in a single action." *National Lumber, supra.*

On appeal, Keystone asserts that only through discovery did

it learn of Bartlett's malfeasance and, therefore, the claims embodied in its dismissed complaint do not fit within the scope of the rule. In other words, Keystone argues that it did not have evidence to support those claims "against [the] opposing party" "at the time of serving the pleading," i.e., its answer, upon Bartlett. Mass.R.Civ.P. 13(a). Though in the abstract this argument has some appeal, on this record, it cannot prevail. See *Dindo* v. *Whitney*, 451 F.2d 1 (1st Cir. 1971) (reversing dismissal where record failed to establish whether litigant knew of existence of right to counterclaim). The undisputed facts belie the notion that Keystone was unaware of Bartlett's questionable billing practices at the time of serving Bartlett with its answer.

First, Custard had already formed its opinion that the invoiced amount was approximately twice fair market value. Custard supplied Keystone with this expert, though preliminary, opinion prior to the initiation of Bartlett's suit. Second, Keystone propounded discovery targeting Bartlett's billing practices, which, as referred to above, provided evidence of Bartlett's billing malfeasance. Finally, in the parties' joint pretrial memorandum, filed before the completion of discovery, Keystone expressed its expectation that "the evidence [will] show that [Bartlett] grossly overstated the damages and costs of repairs."

It is settled law in this Commonwealth that a plaintiff "may not raise a claim in [a subsequent c]ourt which was available as a defense in [a prior] action." *Yentile* v. *Howland*, 26 Mass. App. Ct. 214, 216 (1988). Thus, even assuming that Keystone had not discovered Bartlett's billing misdeeds until late into pretrial litigation, the fact that it proffered such evidence in its defense of the collection claim forecloses its right to bring a separate action later based upon that same misconduct. Accordingly, we discern no error in the judgment of dismissal.[6]

*Bartlett's cross-appeal.* In its cross-appeal, Bartlett asserts

---

[6]Given the history of this appeal and the prior litigation, we must also echo our words in *National Lumber, supra* at 189 n.7: "[T]he present appeal does not concern the propriety of the denial, on timeliness grounds, of [Keystone's] motion to amend its answer in the [previous] action to assert the claims asserted in the present complaint. However, . . . [Bartlett's] opposition to [Keystone's] motion to add such counterclaims does not render [Bartlett's] claim that the counterclaims were compulsory disingenuous; that the counterclaims were compulsory does not compel [Bartlett] to acquiesce in their untimely assertion." But see *Smith* v. *Consalvo*, 37 Mass. App. Ct. 192,

that the motion judge abused his discretion in denying its motion to dismiss pursuant to G. L. c. 231, § 59H.[7] Bartlett argues that this ruling must be reversed because Keystone's claims were in retaliation for Bartlett's collection action for the repairs to the roadway and protected by the statute. Therefore, the matter must be remanded for an assessment of its attorney's fees in accordance with § 59H. "[B]ecause resolution of the issue bears on [Bartlett's] claim for attorney's fees under the anti-SLAPP statute . . we consider it." *Giuffrida* v. *High Country Investor, Inc.*, 73 Mass. App. Ct. 225, 243 (2008). We, therefore, must determine whether Keystone's complaint alleging abuse of process, deceit, negligent misrepresentation, and deceptive business practices pursuant to G. L. c. 93A would survive a motion to dismiss pursuant to the anti-SLAPP statute. We have determined that it would and we affirm the denial of that motion.

We begin our anti-SLAPP analysis by determining whether the common-law tort of abuse of process as raised here would survive the § 59H motion. The Supreme Judicial Court has applied a constitutional construction to § 59H in a manner that will not "alter[] procedural and substantive law in a sweeping way." *Duracraft Corp.* v. *Holmes Prods. Corp.*, 427 Mass. 156, 167 (1998). See *Benoit* v. *Frederickson*, 454 Mass. 148, 156-157 (2009) (Cordy, J., concurring) (opining that an interpretation of § 59H that would abolish malicious prosecution or abuse of process "would . . . be constitutionally suspect").[8]

The tort of abuse of process is comprised of the following

199 (1994) (holding "[d]enial of [defendant's] attempt to file a counterclaim coming . . . after [plaintiff's] petition . . . had been scheduled for trial, was within the discretion of the . . . judge"). We further note that, although Keystone obtained a favorable verdict from the jury, it had the right to appeal the order of the District Court judge denying its motion to amend its answer to add counterclaims, yet failed to exercise that right.

[7] "General Laws c. 231, § 59H, protects the 'exercise of [the] right of petition under the constitution of the United States or of the [C]ommonwealth,' by creating a procedural mechanism, in the form of a special motion to dismiss, for the expedient resolution of so-called 'SLAPP' suits." *Office One, Inc.* v. *Lopez*, 437 Mass. 113, 121 (2002). See also *Kobrin* v. *Gastfriend*, 443 Mass. 327, 331-333 (2005) (discussing the history of § 59H and the types of petitioning activity that the Legislature sought to protect).

[8] See also *Matter of the Discipline of an Attorney*, 442 Mass. 660, 673 (2004) ("[w]e recognize that, because the Massachusetts anti-SLAPP statute 'makes no provision for a plaintiff to show that its own claims are not

elements: "(1) 'process' was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage." *Vittands* v. *Sudduth,* 49 Mass. App. Ct. 401, 406 (2000), quoting from *Kelley* v. *Stop & Shop Cos.,* 26 Mass. App. Ct. 557, 558 (1988). The tort has been described as usually involving a "form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money." *Vittands* v. *Sudduth, supra,* quoting *Cohen* v. *Hurley,* 20 Mass. App. Ct. 439, 442 (1985). While the process may have been properly obtained, its misuse constitutes the conduct that is the basis of the tort for which liability is imposed. See Restatement (Second) of Torts § 682 comment a (1977). "There is, in other words, a form of extortion" in the abuse of process. *Cohen, supra* at 442, quoting from Prosser & Keeton, Torts § 121, at 898 (1984) (quotations omitted).

We must interpret and apply the anti-SLAPP statute and our case law in such a way as to continue to permit, where appropriate and consistent with the intent of § 59H, claims of abuse of process as delineated by the Massachusetts common law. See *Adams* v. *Whitman,* 62 Mass. App. Ct. 850, 854-857 & n.9 (2005). At the first stage of the § 59H procedure, as set out in *Duracraft Corp.* v. *Holmes Prods. Corp., supra* at 167, Bartlett must demonstrate that Keystone's allegation of abuse of process is " 'based on' the petitioning activities *alone* [i.e., Bartlett's claim for payment for the repairs] and ha[s] no *substantial* basis other than or in addition to [that] petitioning activit[y]."[9]

---

frivolous,' . . . the statute could be misused to allow motions for expedited dismissal of nonfrivolous claims in contravention of the Legislature's intent. To address this concern, we adopted a construction of the statute that would prevent dismissal of suits raising 'meritorious claims with a substantial basis other than or in addition to the petitioning activities implicated' ").

[9]The Supreme Judicial Court added a significant observation in its discussion of the legislative meaning of the phrase "based on" when it observed that the phrase did "not mean 'in response to' although claims and related pleadings filed in court may be classified as petitioning activities, plaintiffs are not thereby immunized from counterclaims filed in response to the claim." *Duracraft Corp., supra* at 168 n.20. This does not mean that counterclaims are automatically permitted to survive a § 59H challenge. See, e.g., *Giuffrida* v. *High Country Investor, Inc.,* 73 Mass. App. Ct. 225, 243-244 (2008). However, neither is it to say that counterclaims, relating in part to a plaintiff's petitioning activity, are automatically dismissed in the same context. Obviously counterclaims not directly concerning petitioning activity should not be subject to a § 59H challenge.

*Id.* at 167-168 (emphasis added). For the purposes of a § 59H motion, Bartlett's motive in initiating its petitioning activity is irrelevant at this stage. *Office One, Inc.* v. *Lopez,* 437 Mass. 113, 122 (2002). "The focus solely is on the conduct complained of, and, if the *only* conduct complained of is the petitioning activity, then there can be no other 'substantial basis' for the claim." *Ibid.*

To survive an anti-SLAPP motion, *Office One* and its progeny require a showing of conduct separate and independent from the petitioning activity. Such separate conduct, as discussed above, will always be evidence of ulterior motive for the petitioning activity. We understand *Office One* to mean, therefore, that allegations of an ulterior motive unsupported by conduct independent of the petitioning activity are irrelevant to the first stage analysis. We are required to determine then whether Bartlett has established that there is no conduct on its part other than filing the claim. Since such independent conduct will always be evidence of an ulterior motive, and is also necessary to support an abuse of process claim, the fact that the conduct demonstrates motive is not contrary to *Duracraft Corp.* and *Office One.* The rule enunciated in *Office One* is a simple and practical test intended to prevent a bald, potentially unfounded accusation of improper use of petitioning activity to survive a motion to dismiss pursuant to the anti-SLAPP statute. To hold that evidence of improper action, separate and distinct from the exercise of petitioning activity, is necessary as a threshold requirement simply means that attribution of a motive, alone, is never sufficient. Considering the foregoing standard, properly understood, we believe that Bartlett failed to meet its threshold burden.[10]

---

[10]In addition to evidence developed through discovery and Custard's expert analysis detailed above, more evidence of billing irregularities was developed at trial. At trial Bartlett called eight witnesses and Keystone called three. Keystone cross-examined Bartlett employees on the issue of its billing practices and, through this impeachment, obtained evidence of billing irregularities. For example, on cross-examination, an employee of Bartlett, Richard Maguire, conceded that he had not depreciated the value of equipment, based on its age, in reaching a figure for the overhead charged to Keystone. During another exchange, Maguire admitted that Bartlett charged Keystone for twelve hours of overtime for a State trooper working the relevant safety detail, when he had only worked ten hours of overtime according to Bartlett's internal payroll documentation.

In this cross appeal, Keystone argues that its abuse of process claim and its other claims were not made exclusively in response to Bartlett's collection action but were primarily the result of Bartlett's "excessive billing and knowing overstating [*sic*] of repair costs." Keystone argues that its claims were based primarily on Bartlett's administrative misconduct both prior to and subsequent to the commencement of Bartlett's collection action, which independently demonstrated its ulterior motive and was not solely based on its use of process, and we agree.[11]

Here, Keystone supported its claim of abuse of process by alleging improper conduct by Bartlett before, after, and separate from Bartlett's petitioning activity. In fact, Keystone engaged Bartlett in Bartlett's petitioning activity, for the purpose of determining both its own liability and, if appropriate, a fair measure of damages. The facts of this case demonstrate that Bartlett filed its collection action in the District Court immediately after being notified of Keystone's growing concerns over its billing practices and the specific amount billed. Bartlett's offer of settlement to Keystone was mailed after Bartlett's collection action was filed, and the offer remained almost twice Custard's estimated fair market value of Bartlett's repair work. This tactic is arguably consistent with an attempt by Bartlett to coerce payment of its inflated bill before Keystone could complete its research into the appropriateness of that bill. Contrary to Bartlett's contention that Keystone was objecting to its use of legal process, Keystone actually moved the collection action to the District Court's civil docket for a jury trial. Keystone's action, using the petitioning activity initiated by Bartlett, sought to determine whether Petrosso had been negligent and, if so, a determination of the actual damages. The jury found that Petrosso had not been negligent and, therefore, did not need to determine a fair estimate of damages. Far from objecting to

---

[11]Regardless whether some opinions might be read to describe abuse of process, in dictum or not, as turning on conduct occurring chronologically "subsequent" to the issuance of the process, see *Fabre* v. *Walton*, 436 Mass. 517, 519 n.3 (2002); *Adams* v. *Whitman*, 62 Mass. App. Ct. at 854-855, there is nothing in the cases that renders prior (or concurrent) conduct *irrelevant* to our analysis. If ulterior motive lies at the heart of the tort, then logically any conduct that might evidence such a motive should be considered. See *Ladd* v. *Polidoro*, 424 Mass. 196, 198 (1997).

the use of legal process, Keystone attempted to use that same process to determine its liability and, if liable, the fair cost of the repair work.

Unlike previous reported cases mandating dismissal of abuse of process claims, the conduct complained of here is not solely Bartlett's petitioning activity. See, e.g., *Fabre* v. *Walton*, 436 Mass. 517, 523-524 (2002); *Wenger* v. *Aceto*, 451 Mass. 1, 5-6 (2008); *Benoit* v. *Frederickson, supra* at 153. There existed a *"substantial* basis" for these claims other than the petitioning activity. See *Fabre, supra* at 524, quoting from *Duracraft Corp., supra* at 167 (holding "[a] special motion to dismiss will not succeed against a 'meritorious claim[] with a *substantial* basis other than or in addition to the petitioning activities implicated' " [emphasis in original]).

Keystone's abuse of process complaint is not predicated solely on what it considered to be Bartlett's ulterior motive in filing the collection action. It also is predicated on Bartlett's administrative misconduct prior to and subsequent to filing the collection action. Compare *Fabre* v. *Walton, supra* at 524 n.10. There is ample evidence in the record to support Keystone's claim. The abuse of process claim is, therefore, more than a bald and unfounded accusation and withstands the special motion to dismiss pursuant to § 59H.

Similarly, the counts for deceit, negligent misrepresentation, and violation of G. L. c. 93A are grounded in Bartlett's alleged billing misconduct and not in the fact that it sued for payment. These causes of action were not based solely on Bartlett's petitioning activity but were "in response to" the petitioning activity and were in the form of claims that were compulsory counterclaims in the prior lawsuit. Bartlett, as the special movant, did not meet its threshold burden under G. L. c. 231, § 59H.[12] We discern no error in the order denying Bartlett's

---

[12]Bartlett having failed in its burden in the first of this two-step procedure, the burden does not shift to Keystone. We are, therefore, not required to determine whether Keystone could show by a preponderance of the evidence that Bartlett's petitioning activity was "devoid of any reasonable factual support or any arguable basis in law," and that "[Bartlett's] acts caused actual injury" to Keystone, *Fabre* v. *Walton, supra* at 520, quoting from G. L. c. 231, § 59H, although such a showing may have been possible here.

special motion to dismiss pursuant to G. L. c. 231, § 59H, or in the judgment entered pursuant to Mass.R.Civ.P. 12(b)(6).

*Order denying special motion to dismiss pursuant to G. L. c. 231, § 59H, affirmed.*

*Judgment affirmed.*