JESSE MAXWELL *vs.* AIG DOMESTIC CLAIMS, INC.

Suffolk. February 7, 2011. - June 30, 2011.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, & GANTS, JJ.

*Abuse of Process. Malicious Prosecution. Emotional Distress. Fraud. Insurance,* Fraud and concealment. *Workers' Compensation Act,* Fraud, Exclusivity provision. *Practice, Civil,* Interlocutory appeal, Execution. *Jurisdiction,* Superior Court. *Consumer Protection Act,* Demand letter. *Statute,* Construction.

This court, although concluding that the question whether the exclusivity provisions of the Workers' Compensation Act deprive the Superior Court of subject matter jurisdiction was not properly the subject of interlocutory appeal, permitted an appeal from a denial of a motion for summary judgment, where another question (i.e., an insurer's qualified immunity regarding its reporting of potentially fraudulent activities) was properly before the court, the collateral matter had been fully developed, and the question of subject matter jurisdiction may be raised by the parties at any time or by the court on its own motion. [97-100]

In a civil action alleging malicious prosecution, infliction of emotional distress, abuse of process, and violations of G. L. cc. 93A and 176D based on the defendant workers' compensation insurer's conduct in referring the plaintiff's workers' compensation claim to the insurance fraud bureau, communicating with fraud investigators and prosecutors regarding the plaintiff's activity and claim, and using criminal processes to gain leverage in dealings with the plaintiff, the judge correctly denied the defendant's motion for summary judgment, where, although the defendant enjoyed qualified immunity regarding its reporting of potentially fraudulent activity and had no duty of reasonable investigation, the plaintiff's claims relied, at least in part, on conduct falling outside the scope of immunity [100-106]; moreover, the exclusivity provisions of G. L. c. 152, the Workers' Compensation Act, did not deprive the Superior Court of subject matter jurisdiction over the plaintiff's claims, where none of the plaintiff's claims rested solely on the defendant's claims-handling activities [106-117].

CIVIL ACTION commenced in the Superior Court Department on October 31, 2005.

The case was heard by *Linda E. Giles,* J., on a motion for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*Myles W. McDonough* (*Christopher M. Reilly* with him) for the defendant.

*Chester L. Tennyson, Jr.*, for the plaintiff.

*E. Michael Sloman*, for Insurance Fraud Bureau, amicus curiae, submitted a brief.

*David D. Dowd*, for Property Casualty Insurers Association of America, amicus curiae, submitted a brief.

SPINA, J. In this proceeding we consider the appeal of AIG Domestic Claims, Inc. (AIGDC), from the denial of its motion for summary judgment. Jesse Maxwell, a workers' compensation claimant, brought suit against AIGDC regarding the company's conduct in referring his claim to the insurance fraud bureau (IFB), communicating with fraud investigators and prosecutors regarding his activity and claim, and using criminal processes to gain leverage in dealings with him. Maxwell sought recovery on theories of malicious prosecution, infliction of emotional distress, abuse of process, and violation of G. L. cc. 93A and 176D. In July, 2007, AIGDC filed a special motion to dismiss the suit pursuant to G. L. c. 231, § 59H, the so-called "anti-SLAPP" statute. That motion was denied and AIGDC's appeal was unsuccessful. See *Maxwell* v. *AIG Domestic Claims, Inc.*, 72 Mass. App. Ct. 685 (2008). On remand, the parties conducted discovery and AIGDC filed a motion for summary judgment in August, 2009. Summary judgment was denied. AIGDC appealed under the doctrine of present execution, and we granted its application for direct appellate review.[1]

We conclude that AIGDC enjoys qualified immunity regarding its reporting of potentially fraudulent activity but that summary judgment is inappropriate because all of Maxwell's claims rely, at least in part, on conduct falling outside the scope of the immunity. We also conclude that portions of Maxwell's claims may be barred by workers' compensation exclusivity under G. L. c. 152, but that not one of Maxwell's counts is barred entirely such that the Superior Court would be without subject matter jurisdiction. Accordingly, we affirm the order of the Superior Court denying summary judgment and remand the case for further proceedings consistent with this opinion.

---

[1] We gratefully acknowledge the amicus briefs submitted by the Insurance Fraud Bureau and the Property Casualty Insurers Association of America.

1. *Background.* In the light most favorable to Maxwell, the nonmoving party, the materials submitted on summary judgment support the following.

On October 8, 2000, Maxwell sustained an injury in the course of his employment, reported the injury, and filed a workers' compensation claim. AIGDC denied the claim, citing Maxwell's failure to provide medical documentation substantiating his injury, his disability, and the causal relation between the two. In response, Maxwell filed medical documentation and challenged AIGDC's denial through the administrative procedures of the Department of Industrial Accidents (DIA). A DIA conference regarding Maxwell's claim was scheduled for April 30, 2001.

Without workers' compensation benefits and unable to work, Maxwell became homeless while waiting for the DIA conference and began living in various shelters. As a condition of his residence at the Boston YMCA, Maxwell was required to participate in a training program operated by Community Work Services (CWS), a charitable organization that provides disabled and challenged individuals with vocational and rehabilitative training. CWS placed Maxwell in a commercial cleaning training program in which he performed limited janitorial functions in a controlled environment. In connection with the program, Maxwell received a stipend administered by the city of Boston and funded through a grant from the United States Department of Housing and Urban Development. CWS did not consider Maxwell to be an employee, did not consider his stipend to be wages or earnings, and did not believe that his participation in the training program indicated that he was capable of working in the open market. Further, various governmental agencies, including State and Federal revenue departments, do not consider the stipend to be earnings or wages.

The DIA conference ultimately was scheduled for April 30, 2001. Prior to the conference Maxwell attended an impartial medical examination on April 25, 2001, at which he signed a form reporting that he was not presently working. AIGDC had arranged for a private investigator to undertake surveillance of Maxwell and informed the investigator of Maxwell's scheduled appointment. The investigator followed Maxwell from the examination to the Naval Reserve Recruitment Center in Quincy,

where Maxwell had been assigned pursuant to the CWS training program. The investigator observed and videotaped Maxwell performing janitorial functions at the center. The private investigator then filed a report with AIGDC concluding that "Maxwell is currently employed as a janitor at the Naval Reserve Recruitment Center in Quincy."

AIGDC thus had reason to believe Maxwell was working when, at the DIA conference on April 30, 2001, he completed a DIA-mandated earnings report in which he declared no wages. AIGDC did not present the DIA administrative judge with information regarding the private investigator's findings, and the administrative judge ordered that AIGDC pay workers' compensation benefits to Maxwell. The same day, AIGDC formally opened an internal fraud investigation.

The company's investigation concluded that "[Maxwell] works for a temp agency called Community Work Services, located 174 Portland Street in Boston." Because Maxwell was receiving workers' compensation benefits while apparently working, AIGDC's investigation concluded that Maxwell may be committing insurance fraud and, accordingly, referred the case to the IFB.[2] The IFB conducted its own investigation, received updates and additional information from AIGDC, and concluded that it should recommend charges of larceny and workers' compensation fraud. The IFB then referred the matter to the Suffolk County district attorney who, after meeting with AIGDC officials on at least one occasion, charged Maxwell in October, 2001, with workers' compensation fraud pursuant to G. L. c. 152, § 14, and larceny over $250 pursuant to G. L. c. 266, § 30.[3]

In December, 2001, AIGDC's complex claims specialist, Alice M. Hathaway, began corresponding with Maxwell's counsel seeking voluntary relinquishment of the benefits awarded Maxwell at

---

[2]"The [IFB] is not a State agency but a private entity . . . authorized by special act [of the Legislature] to combat insurance fraud in the workers' compensation and automobile insurance systems by investigating charges of such fraud and referring suspected violations for criminal prosecution." *Adams* v. *Liberty Mut. Ins. Co.*, 60 Mass. App. Ct. 55, 58 n.7 (2003). See St. 1996, c. 427, § 13.

[3]The office of the Attorney General subsequently assumed responsibility for the prosecution.

the DIA conference.[4] In the same period, Maxwell attempted suicide for the first time and began a series of hospitalizations. These hospitalizations necessitated a number of postponements in the criminal proceeding against Maxwell. In January, 2002, Hathaway offered on AIGDC's behalf to settle Maxwell's claim for one dollar in exchange for a waiver of AIGDC's right to seek costs and penalties under G. L. c. 152, § 14. When Maxwell refused the offer, AIGDC moved in the DIA proceeding to redetermine Maxwell's benefits, to recoup benefits already paid, and for penalties pursuant to G. L. c. 152, § 14.

In addition to delaying the criminal proceeding, Maxwell's hospitalizations also delayed the DIA proceeding under which AIGDC sought to terminate his workers' compensation benefits. Aware that Maxwell was on probation for an unrelated drug offense and that an insurer may discontinue payment of benefits to an incarcerated claimant, Hathaway contacted Maxwell's probation officer and sought to have his probation surrendered. When the probation officer refused to cooperate, Hathaway wrote a letter to the district attorney, alleging that Maxwell "conveniently signs himself into McLean's Hospital" when he is scheduled to appear in court. Hathaway explained her predicament ("Unfortunately, I am still paying this gentleman . . .") and requested that prosecutors assist AIGDC in securing the surrender of Maxwell's probation should he, as Hathaway expected, "be conveniently an in-patient at McLean's Hospital" on the date of the next criminal hearing.[5] Maxwell's probation was not surrendered.

The DIA hearing was ultimately held on April 25, 2002. A number of witnesses testified regarding the nature of the CWS training program and the Federal grant funding Maxwell's stipend. The administrative judge took the matter under advisement and, more than two years later on May 7, 2004, issued a

---

[4]Maxwell's original complaint listed both AIGDC and Alice M. Hathaway as defendants. The sole defendant in Maxwell's amended complaint, however, is AIGDC. Hathaway appears to have occupied a number of different positions at AIGDC at various times, and her precise job description is not relevant in this proceeding.

[5]Hathaway denies actually sending the letter, but AIGDC accepts that, for purposes of summary judgment, the matter must be viewed in the light most favorable to Maxwell.

decision and order finding that Maxwell "was totally disabled within the meaning of the [workers' compensation] Act," "[his] activities for [CWS] did not constitute employment and are not evidence that he could have obtained work in the open labor market," "the stipend paid [him] . . . does not constitute 'earnings' within the meaning of the Act," and "[he] had no intention of defrauding the insurer." AIGDC's motion for penalties was denied. Further, AIGDC was ordered to pay to Maxwell his attorney's fees, costs and expenses, workers' compensation benefits for the entire period from his injury through the present, interest on any unpaid benefits, and the costs of surgery on Maxwell's shoulder should he elect to undergo the procedure.

There was a two-year gap, however, between the DIA hearing and the issuance of the order, during which time the criminal proceeding continued. Trial in the Boston Municipal Court was scheduled for November 13, 2003, and despite the evidence introduced at the DIA hearing and being represented by counsel in the criminal proceeding, Maxwell pleaded guilty prior to the trial. Maxwell's pleas were accepted and he was sentenced to one year in prison for each offense, suspended for three years, with probation. Restitution to AIGDC in the amount of $9,013 subsequently was ordered.[6]

The record does not indicate what steps, if any, AIGDC took in pursuit of restitution between November, 2003, and the issuance of the DIA decision in May, 2004. Nearly one year after receipt of that decision, however, an AIG fraud investigator wrote a letter to the probation department regarding the restitution ordered in the criminal proceeding. The investigator reported that he "represent[ed] the victim American International Group," that AIGDC had "been defrauded," and that "restitution was ordered by the court." The investigator testified at deposition that the purpose of the letter was to use criminal process to compel Maxwell to pay restitution to AIGDC because (despite knowing that "[w]e may owe [Maxwell] $8,000" because of the DIA decision), "as far as I was concerned, we were still owed the [restitution]."

On May 27, 2005, Maxwell moved in the Boston Municipal

---

[6]There is no information in the record indicating how this amount was calculated.

Court for a new trial and to withdraw his guilty pleas. A judge ruled that the DIA decision and findings constituted newly discovered evidence that "call[s] into question whether justice has been done in this matter." Further, the judge concluded that, although Maxwell was competent in November, 2003, "his ongoing struggle with mental illness may have clouded his judgment as to whether his plea was in his best interests." On August 24, 2005, citing "the interest of justice," the Attorney General filed a nolle prosequi. Maxwell instituted the present action on October 31, 2005.

2. *Standard of review.* "A court must deny a motion for summary judgment if, viewing the evidence in the light most favorable to the nonmoving party, there exist genuine issues of material fact . . . ."[7] *Locator Servs. Group, Ltd.* v. *Treasurer & Receiver Gen.,* 443 Mass. 837, 846 (2005), quoting *Golub* v. *Milpo, Inc.,* 402 Mass. 397, 400 (1988). See Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002). "An order granting or denying summary judgment will be upheld if the trial judge ruled on undisputed material facts and his ruling was correct as a matter of law." *Commonwealth* v. *One 1987 Mercury Cougar Auto.,* 413 Mass. 534, 536 (1992).

3. *Interlocutory appeal.* Before addressing the substance of this proceeding, we first consider the matters that are properly before us on interlocutory appeal.

Denial of a motion for summary judgment is interlocutory and hence not subject to appeal as of right. See *Elles* v. *Zoning Bd. of Appeals of Quincy,* 450 Mass. 671, 672, 673-674 (2008) (*Elles*); *Rollins Envtl. Servs., Inc.* v. *Superior Court,* 368 Mass. 174, 180 (1975); J.R. Nolan & K.A. Durning, Appellate Procedure § 1:8, at 12 (3d ed. 2009). The doctrine of present execution establishes an exception, however, "where the interlocutory ruling 'will

---

[7]The parties have not addressed the applicability of collateral estoppel, offensive or defensive, to those factual questions resolved in the proceeding before the Department of Industrial Accidents (DIA) and presented in this case. See *Tuper* v. *North Adams Ambulance Serv., Inc.,* 428 Mass. 132, 134-136 (1998) (considering applicability of offensive collateral estoppel to unemployment compensation decision but concluding issues involved were not identical); *Martin* v. *Ring,* 401 Mass. 59, 63 (1987) (holding that decision of DIA has issue preclusive effects for defensive purposes). We decline to raise the issue sua sponte and instead view the evidence in the light most favorable to Maxwell.

interfere with rights in a way that cannot be remedied on appeal' from the final judgment, and where the matter is 'collateral' to the merits of the controversy." *Elles, supra* at 674, quoting *Maddocks* v. *Ricker,* 403 Mass. 592, 597-600 (1988). Immunity from suit is one right which, if allegedly interfered with by an interlocutory ruling, gives right to appeal under this doctrine. See *Kent* v. *Commonwealth,* 437 Mass. 312, 316 (2002). Present execution applies because the question of immunity is collateral to the merits of the case and because immunity from suit entitles a party to avoid not only liability but also the burden of the litigation. See *Littles* v. *Commissioner of Correction,* 444 Mass. 871, 875 (2005) (" 'immunity from suit' is the impetus behind interlocutory appeals from the denial of immunity"); *Breault* v. *Chairman of the Bd. of Fire Comm'rs of Springfield,* 401 Mass. 26, 31 (1987), cert. denied sub nom. *Forastiere* v. *Breault,* 485 U.S. 906 (1988) ("If . . . the asserted right is one of freedom from *suit,* the defendant's right will be lost forever unless that right is determined [on an interlocutory appeal]" [emphasis in original]).

As discussed further *infra,* St. 1996, c. 427, § 13, is designed to ensure that insurers err on the side of overreporting potentially fraudulent conduct. Indeed, the statute mandates that insurers promptly report transactions to the IFB where they merely "hav[e] reason to believe" that fraud may have occurred. St. 1996, c. 427, § 13 (*e*). Additionally, the immunity granted by St. 1996, c. 427, § 13 (*i*), is designed further to encourage reporting by shielding insurers from civil liability "[i]n the absence of malice or bad faith . . . ." Reporting to the IFB might be chilled if protection could be secured only after litigating a claim through to conclusion, so we conclude that St. 1996, c. 427, § 13 (*i*), should be interpreted as providing immunity from suit rather than mere immunity from liability. Given this holding, AIGDC is entitled under the doctrine of present execution to interlocutory review of the ruling that statutory immunity does not preclude Maxwell's claims. See *Kent* v. *Commonwealth, supra.*

The availability of statutory immunity, however, is not the principal subject of AIGDC's argument on appeal. Rather, the majority of the company's brief asserts that the exclusivity provisions of G. L. c. 152, the Workers' Compensation Act, deprive the Superior Court of subject matter jurisdiction. Maxwell fully

briefs the subject and it is addressed in the amicus briefs. AIGDC makes only the most cursory argument in support of its request to be heard on this issue, but Maxwell does not argue that the subject matter jurisdiction appeal should be dismissed.

"As a general rule, an aggrieved litigant cannot as a matter of right pursue an immediate appeal from an interlocutory order unless a statute or rule authorizes it." *Elles, supra* at 673-674. There is no statute or rule applicable to the exclusivity question, and the ruling regarding subject matter jurisdiction is thus not properly the subject of interlocutory appeal. The issue, however, is fully developed in the record, extensively argued by the parties, and certain to reappear in later stages of this already protracted litigation. We are thus left with the equally undesirable options of wasting judicial resources through duplicative, piecemeal appellate litigation and permitting AIGDC to circumvent a bedrock principle of appellate procedure.[8] We conclude that the former is the lesser evil in this unique circumstance because there is already one question properly before the court that must be decided in any event, because the collateral matter is fully developed, and because the question of subject matter jurisdiction may be raised by the parties at any time or by the court on its own motion. See *Miller* v. *Miller*, 448 Mass. 320, 325 (2007) (where both parties have briefed issue, "it would be a waste of judicial resources for that issue to remain unresolved"); *ROPT Ltd. Partnership* v. *Katin*, 431 Mass. 601, 606-607 (2000) (party

---

[8]"[I]nterlocutory rulings may not be presented piecemeal to the Appeals Court or to [this court] for appellate review" because, "if such were not the rule, a creative party could engage in numerous opportunities to appeal from adverse rulings, thus significantly and needlessly aging the case." *McGrath* v. *McGrath*, 65 Mass. App. Ct. 670, 672 (2006), quoting *Manousos* v. *Sarkis*, 382 Mass. 317, 321 (1981). Further, "[i]f the rule were otherwise, 'a dilatory defendant would receive not only his allotted bite at the apple, but an invitation to gnaw at will." *McGrath* v. *McGrath, supra*, quoting *Fisichelli* v. *Methuen*, 884 F.2d 17, 19 (1st Cir. 1989).

AIGDC clearly is aware of proper procedures and simply has been unsuccessful in pursuing them. In addition to the notice of appeal filed with the Superior Court, AIGDC filed an "emergency" motion for the report of certain questions of law pursuant to Mass. R. Civ. P. 64 (a), as amended, 450 Mass. 1402 (2008). The motion was denied. AIGDC also requested leave to pursue interlocutory review from a single justice of the Appeals Court under G. L. c. 231, § 118, and from a single justice in this court under G. L. c. 211, § 3. Both of these petitions were denied.

may raise subject matter jurisdiction at any time); *Nature Church* v. *Assessors of Belchertown*, 384 Mass. 811, 812 (1981) (courts have "both the power and the obligation to resolve problems of subject matter jurisdiction whenever they become apparent").

We therefore consider both the question of statutory immunity and the extent to which workers' compensation exclusivity deprives the Superior Court of subject matter jurisdiction.

4. *Analysis.* Maxwell's complaint includes counts of malicious prosecution, infliction of emotional distress, abuse of process, and violation of G. L. cc. 93A and 176D. The first three of these counts contain, verbatim, the same alleged conduct by AIGDC — "caus[ing] a criminal complaint to be brought against [Maxwell]." The fourth count references Maxwell's G. L. c. 93A demand letter that, in turn, incorporates the background facts set forth in the Appeals Court's decision, *Maxwell* v. *AIG Domestic Claims, Inc.*, 72 Mass. App. Ct. 685 (2008). On summary judgment AIGDC argued that it is immune from civil liability arising out of its obligation to report suspected insurance fraud to the IFB; that Maxwell's malicious prosecution and emotional distress claims are legally insufficient; that the Superior Court lacks subject matter jurisdiction to hear claims that are barred by the workers' compensation exclusivity; that Maxwell's abuse of process claim is legally insufficient; and that Maxwell's demand letter was insufficient to satisfy the requirements of G. L. c. 93A, § 9 (3). A Superior Court judge denied the motion for summary judgment.

On direct appeal AIGDC argues that the motion judge erred (1) in concluding that Maxwell's claims are not subject to the exclusive remedy of workers' compensation, and (2) in failing to grant summary judgment on grounds of statutory immunity.[9] We consider these questions in reverse order and conclude that,

---

[9]In addition, AIGDC identifies a number of alleged errors in the Appeals Court's decision affirming the order denying AIGDC's special motion to dismiss pursuant to G. L. c. 231, § 59H. See *Maxwell* v. *AIG Domestic Claims, Inc.*, 72 Mass. App. Ct. 685 (2008). We denied AIGDC's application for further appellate review. 452 Mass. 1107 (2008). This appeal, from the denial of summary judgment, is not a forum for relitigation of the special motion to dismiss or for further consideration of G. L. c. 231, § 59H.

AIGDC also argues that it was error for the motion judge to have incorporated by reference the background set forth in the Appeals Court's decision. To

for the reasons set forth herein, the arguments advanced by AIGDC do not entitle it to summary judgment.

a. *Statutory immunity.* Maxwell's claims of malicious prosecution, infliction of emotional distress, and abuse of process all stem from the fact that he was prosecuted for larceny over $250 in violation of G. L. c. 266, § 30, and for workers' compensation fraud in violation of G. L. c. 152, § 14. Maxwell's theory in these counts is that this prosecution was ultimately set in motion by AIGDC's report of potentially fraudulent activity to the IFB and sustained through AIGDC's subsequent misleading communications with prosecutors. In his first three counts Maxwell thus seeks to hold AIGDC responsible for harms caused to him by the prosecution in general rather than merely AIGDC's conduct in making a report to the IFB.[10]

In response, AIGDC argues that Maxwell's claims fail, and that it is entitled to summary judgment, because insurer reports to the IFB are subject to immunity under St. 1996, c. 427, § 13 (*i*). The motion judge found otherwise, concluding that statutory immunity does not entitle AIGDC to summary judgment because there is "a legitimate factual dispute as to whether [AIGDC] had satisfied its duty of reasonable investigation so as to support a 'reason to believe' [and thus a duty to report]." AIGDC has appealed from this ruling and argues that the imposition of a "duty of reasonable investigation" is not warranted by statute.

clarify the posture of this case, we note that the Appeals Court's narrative drew from material available on the special motion to dismiss and does not constitute findings binding on the parties or conclusive in this appeal.

As regards the legal conclusions of the Appeals Court, "[t]his court generally declines to reconsider questions which have been decided in an earlier appeal in the same case," but "if we are persuaded that a previous holding in the same case was in error, we will reconsider it." *New England Merchants Nat'l Bank* v. *Old Colony Trust Co.*, 385 Mass. 24, 26 (1982). We therefore do not conduct a wholesale review of the prior appellate decision and will consider only those issues relevant to the motion for summary judgment.

[10]We note that Maxwell's claims of malicious prosecution, infliction of emotional distress, and abuse of process rely exclusively on AIGDC's conduct in reporting fraud to the IFB and encouraging the criminal proceeding. The final count of the complaint, asserting violations of G. L. c. 93A, is more amorphous because it relies not on specific allegations but on Maxwell's demand letter which, in turn, incorporates by reference the facts described in the Appeals Court's decision affirming the denial of the special motion to dismiss. *Maxwell* v. *AIG Domestic Claims, Inc., supra.*

We conclude that AIGDC is correct. Applying proper analysis, however, we further conclude that this immunity does not entitle AIGDC to summary judgment.

"The [IFB] is not a State agency but a private entity . . . authorized by special act [of the Legislature] to combat insurance fraud in the workers' compensation and automobile insurance systems by investigating charges of such fraud and referring suspected violations for criminal prosecution." *Adams* v. *Liberty Mut. Ins. Co.*, 60 Mass. App. Ct. 55, 58 n.7 (2003). See St. 1996, c. 427, § 13. The IFB was developed as part of a larger legislative scheme to control insurance costs and to curb fraudulent practices. *Commonwealth* v. *Ellis*, 429 Mass. 362, 364-366 (1999) (analyzing structure and operation of IFB). See St. 1996, c. 427, § 13 (establishing IFB); St. 1991, c. 398, § 99 (workers' compensation insurance fraud bureau); St. 1990, c. 338 (automobile insurance fraud bureau). Accordingly, the IFB was vested with various "powers and duties . . . for the prevention and investigation of fraudulent insurance transactions." St. 1996, c. 427, § 13. The Legislature enlisted the insurance industry in the fraud prevention effort by mandating that "[a]ny insurer . . . having reason to believe that an insurance transaction may be fraudulent . . . shall within thirty days after determination that the transaction may be fraudulent [report the transaction] to said insurance fraud bureau." *Id.* at § 13 (*e*).

This standard for insurer reporting — "reason to believe" that a transaction "may be fraudulent" — establishes an extremely low threshold of suspicion to be crossed before the insurer's duty to report is triggered. *Id.* In addition, to minimize insurer hesitation and maximize reporting, the statute contains a broad grant of immunity regarding communications with the IFB: "In the absence of malice or bad faith, no insurer . . . shall be subject to civil liability for damages by reason of any statement, report or investigation made pursuant to this section." *Id.* at § 13 (*i*). Read together, subsections (*e*) and (*i*) of the act evince a clear legislative intent to ensure that, where there is any question, insurers will err on the side of overreporting suspicious activity to the IFB. The statute contains no duty of reasonable investigation, and we do not conclude that public policy requires that we establish such a duty through judicial gloss on the statute.

We first consider that, as evidenced by the low threshold of suspicion and the accompanying grant of immunity, the intent of St. 1996, c. 427, § 13, is to maximize reporting of potentially fraudulent activity, ensure prompt reporting, and remove disincentives to reporting. St. 1996, c. 427, § 13 (e), (i). An inferred duty of reasonable investigation, however, would encourage insurers to delay reports to the IFB while investigations continued and would deter insurers from filing reports with the IFB in the absence of solid evidence. Erecting such a hurdle to reporting runs directly counter to the purposes of St. 1996, c. 427, § 13.

Second, we conclude that imposing the proposed duty on reporting insurers misapprehends the structure of the statute. A duty of reasonable investigation would place on insurers the obligation of screening out hasty and erroneous reports of suspicious transactions. The governing statute, however, locates this duty not with insurers but with the IFB. See St. 1996, c. 427, § 13 (e) (insurers must report where they "hav[e] reason to believe that an insurance transaction may be fraudulent"); id. at § 13 (h) (IFB, when "satisfied that a material fraud . . . has been committed . . . shall refer the matter to the attorney general"). From this structure we infer that the Legislature wanted to ensure that all suspicious transactions were reviewed by the IFB rather than being screened by insurers. The duty of reasonable investigation thus rests with the IFB rather than with individual insurers.

Third, we determine that public policy would not be furthered by imposing a duty of reasonable investigation on insurers. Such a duty might be appropriate if it were necessary to protect claimants, but referral of suspicious activity to the IFB is not an adverse action from which claimants must be shielded. Instead, referral merely triggers the IFB's obligation to undertake its own investigation. St. 1996, c. 427, § 13 (f). The IFB's investigation may then result either in closure of the file without action or referral to prosecuting authorities. St. 1996, c. 427, § 13 (h). Even the IFB's investigation and referral do not constitute adverse action, because following such referral the statute, by including no provisions governing prosecutors's actions, "leaves matters of further investigation and any decision to prosecute exclusively in the

[Attorney General's] control." See *Commonwealth* v. *Ellis, supra* at 375. Decisions of both the IFB and Attorney General thus stand between the insurer's report and any adverse action against the claimant. Considering this structure, no public purpose is furthered by imposing an additional layer of scrutiny, a duty of reasonable investigation, between the insurer's "reason to believe that an insurance transaction may be fraudulent" and its report to the IFB. St. 1996, c. 427, § 13 (*e*). Indeed, the public interest might be harmed if insurers enjoyed a larger role in the investigatory process because, unlike the IFB or Attorney General, an insurer has a direct financial interest in demonstrating a transaction to be fraudulent, and this interest might reduce objectivity and lead to overzealous and oppressive efforts to root out fraud where none, in fact, exists.

Finally, the proposed duty conflicts with the grant of statutory immunity. St. 1996, c. 427, § 13 (*i*). In denying summary judgment, the motion judge cited "a legitimate factual dispute as to whether [AIGDC] had satisfied its duty of reasonable investigation" — a formulation suggesting that AIGDC must make certain showings before immunity attaches. Under the statute, however, immunity is available, in "the absence of malice or bad faith." *Id.* This is a form of qualified immunity. See *Kobrin* v. *Gastfriend*, 443 Mass. 327, 341-342 (2005) (defendant enjoyed qualified immunity; question of malice and good faith remanded to trial court). Cf. *id.* at 345-349 (Sosman, J., dissenting) (opining that absolute immunity applied so malice question moot). In interpreting similar qualified immunities and privileges, Massachusetts decisions are uniform in holding that, once immunity has been invoked, the burden of overcoming the immunity rests exclusively with the plaintiff. See *Nelson* v. *Salem State College*, 446 Mass. 525, 538 (2006) (in absence of evidence "that the [public officials] acted in bad faith or with malice," university employees "are shielded from liability by the doctrine of common-law immunity" for discretionary acts); *Ezekiel* v. *Jones Motor Co.*, 374 Mass. 382, 390 (1978); *Gildea* v. *Ellershaw*, 363 Mass. 800, 819-820 (1973); *Camoscio* v. *Smith*, 26 Mass. App. Ct. 922, 923-924 (1988) (persons filing reports with board of podiatry enjoy qualified immunity and plaintiffs "hav[e] the burden of overcoming [statutory] immunity").

Accordingly, it is not AIGDC's obligation to show that it

undertook reasonable investigation and therefore (impliedly) acted without malice. Rather, it is Maxwell's burden, and his burden alone, to demonstrate the existence of malice or bad faith. Cf. *Blackstone* v. *Cashman*, 448 Mass. 255, 261 n.10 (2007) ("the 'actual malice' standard for proving improper motive or means on the part of a corporate official is a heightened burden placed on the plaintiff, not a defense that must be proved by a defendant"). A duty of reasonable investigation that tended to shift this burden to the insurer would not comport with the terms of the statute. In light of this analysis, we therefore conclude that the motion judge erred in requiring AIGDC to demonstrate compliance with such a duty before invoking statutory immunity.[11]

We turn, then, to consider whether statutory immunity entitles AIGDC to summary judgment on Maxwell's claims. Immunity under St. 1996, c. 427, § 13 (*i*), applies to "any statement, report or investigation made pursuant to [St. 1996, c. 427, § 13]." Statutory immunity thus shields from liability only those actions taken pursuant to the fraud reporting process set forth in St. 1996, c. 427, § 13. To the extent that Maxwell's complaint seeks damages resulting from conduct occurring outside the statute, qualified immunity does not protect AIGDC from suit and cannot require the grant of summary judgment.

Maxwell's first three counts are based on AIGDC's conduct in "caus[ing] a criminal complaint to be brought against [him]." This language includes the theory that AIGDC's initial report to the IFB caused the prosecution. The procedures laid out in St. 1996, c. 427, § 13 (*e*), require an insurer to report potentially suspicious activity to the IFB. Statutory immunity thus applies to the initial report, and any tort claims relying on this conduct must be dismissed on summary judgment if the plaintiff fails to present

---

[11]We emphasize that the case before us presents only the question of duties attendant on insurers reporting to the IFB. We note that "[t]he IFB receives reports of suspected insurance fraud from a variety of sources." *Commonwealth* v. *Ellis*, 429 Mass. 362, 375 (1999). See St. 1996, c. 427, § 13 (*f*) (addressing reports from insurers and "other information which provides reason to believe that any person has violated any law of the commonwealth concerning insurance fraud"). Because mandatory reporting applies only to insurers, St. 1996, c. 427, § 13 (*e*), and statutory immunity does not necessarily apply to the general public, St. 1996, c. 427, § 13 (*i*), a different result may obtain where a noninsurer fails to investigate a transaction reasonably before reporting it to the IFB.

affirmative evidence that would support an inference that the immunity has been abused. See St. 1996, c. 427, § 13 (*i*); *Carey* v. *New England Organ Bank*, 446 Mass. 270, 282-283 (2006) (plaintiffs bear enhanced burden on summary judgment to overcome assertions of qualified immunity).

The language of Maxwell's complaint also, however, includes the theory that Maxwell suffered injury as a result of AIGDC's active participation in pressing the proceedings through communications with prosecutors when it did not have cause to believe that Maxwell had committed insurance fraud. The fraud reporting statute does not envision that, following a report to the IFB, the insurer will take an active role in pressing any ensuing criminal prosecution. See St. 1996, c. 427, § 13 (*e*). Indeed, we have concluded, *supra* at 104, that the statute is designed to keep insurers at a healthy remove from the prosecutorial process so that their financial interest in securing a fraud conviction does not result in overbearing or oppressive conduct. Where an insurer acts outside St. 1996, c. 427, § 13, and inserts itself into the prosecutorial process, it is not acting pursuant to the statute and is not entitled to statutory immunity. St. 1996, c. 427, § 13 (*i*). Maxwell's first three counts allege that AIGDC has engaged in such conduct, statutory immunity is thus inapplicable, and summary judgment cannot be granted on this basis.

Similarly, Maxwell's final claim is based, among other things, on the allegation that AIGDC improperly lobbied the probation department and district attorney in an effort to secure his incarceration and thus avoid paying his workers' compensation benefits. There is no provision in St. 1996, c. 427, § 13, pursuant to which an insurer might be required or encouraged to contact the probation department and appeal to prosecutors to revoke a claimant's probation on unrelated charges. Because such conduct is collateral to the statutory fraud reporting process, claims based on it cannot be barred by St. 1996, c. 427, § 13 (*i*).

All the counts set forth in Maxwell's complaint thus rest, at least in part, on conduct by AIGDC that is not subject to statutory immunity. Summary judgment on the basis of St. 1996, c. 427, § 13 (*i*), is thus unwarranted.[12]

b. *Workers' compensation exclusivity.* Even if AIGDC is not

--------

[12]As discussed above, *supra* at 98-100, the sole question properly before

entitled to summary judgment on grounds of qualified immunity, summary judgment would be appropriate if Maxwell is limited to recovery exclusively through DIA procedures and the Superior Court is thus without jurisdiction.

The principal exclusivity provision of the Workers' Compensation Act, G. L. c. 152, § 24, states that an employee "shall be held to have waived his right of action at common law . . . in respect to any injury that is compensable under this chapter, to recover damages for personal injuries." "Where it applies," therefore, "the Workers' Compensation Act is the exclusive remedy available to an employee to secure reparation from his employer for an injury arising out of and in the course of employment." L.Y. Nason, C.W. Koziol, & R.A. Wall, Workers' Compensation § 26.1, at 313 (3d ed. 2003). In determining whether "[c]ommon law actions are barred" we consider whether "the plaintiff is shown to be an employee; his condition is shown to be a 'personal injury' within the meaning of [G. L. c. 152, § 1 (7A)]; and the injury is shown to have arisen 'out of and in the course of . . . employment.' " *Foley* v. *Polaroid Corp.*, 381 Mass. 545, 548-549 (1980), quoting G. L. c. 152, § 26 ("If an employee . . . receives a personal injury arising out of and in the course of his employment . . . he shall be paid compensation . . . ."). "In other words, the key is whether the injury is compensable." *Saab* v. *Massachusetts CVS Pharmacy, LLC*, 452 Mass. 564, 569 (2008), and cases cited.

Maxwell's claims, however, were not brought against his employer, but against AIGDC, his employer's insurer. There is no particular statutory provision extending the exclusivity provisions of G. L. c. 152 to actions brought against workers'

us is whether statutory immunity entitles AIGDC to summary judgment. The only activity shielded by that immunity, however, is activity occurring "pursuant to [St. 1996, c. 427, § 13]." *Id.* at § 13 (*i*). This excludes communication with prosecutors and the probation department, so it is irrelevant to our holding on this interlocutory appeal whether, in undertaking such activity, AIGDC possessed a state of mind that would constitute an abuse of the statutory immunity. *Id.* Although questions of malice may be relevant to the merits of Maxwell's tort claims, these issues are irrelevant to the statutory immunity issue and thus not before us on interlocutory appeal. See *Elles* v. *Zoning Bd. of Appeals of Quincy*, 450 Mass. 671, 673-674 (2008) (doctrine of present execution permits appeal from only those questions that are " 'collateral' to the merits of the controversy").

compensation insurers, but AIGDC argues that such claims are nonetheless barred by workers' compensation exclusivity such that the Superior Court is without subject matter jurisdiction.

The Commonwealth has developed a small body of case law addressing this question and relying not on specific statutory language but on the general purposes of G. L. c. 152. An early case on point, *Matthews* v. *Liberty Mut. Ins. Co.*, 354 Mass. 470 (1968) (*Matthews*), considered the claim of a employee's spouse that a workers' compensation insurer was liable as a third-party defendant because the insurer's accident prevention efforts had been insufficient, resulting in the employee's electrocution and death. See G. L. c. 152, § 15 (regulating rights of both employees and insurers to seek compensation from parties other than employer who may be liable for causing employee's injury). This court determined that the insurer was "perform[ing] a function [i.e., accident prevention] which furthers the goals of the entire compensation program." *Matthews, supra* at 473. As a result, "the defendant insurer stands in the shoes of the employer [and] the plaintiff will be restricted to recovery under the Workmen's Compensation Act." *Id.* at 471. Claims regarding an insurer's choice to assist the employer in protecting employees from injury was thus held to fall within workers' compensation exclusivity because of the benefit of such activity to "workmen and their families" and because "the object of workmen's compensation legislation will be best served by holding that, for purposes of this action, the [insurer] is not 'some person other than the insured' under G. L. c. 152, § 15." *Id.* at 473-474.

The Appeals Court applied similar reasoning twenty years later in the case of *Boduch* v. *Aetna Life & Cas. Co.*, 26 Mass. App. Ct. 462 (1988) (*Boduch*), where a plaintiff brought a G. L. c. 93A claim against a workers' compensation insurer, alleging that the insurer had failed "to make prompt and efficient acceptance" of her claim. *Id.* at 464. In support of this assertion, the plaintiff relied on the fact that the insurer had initially denied the claim; had commenced payment in compliance with an order of the DIA; but had then filed an appeal from that order with the DIA. *Id.* at 467. The Appeals Court held that "the conduct of the insurer at issue here was well within the

primary goal of [G. L.] c. 152, that is, to receive and investigate claims and promptly provide benefits when it is determined that a worker has suffered a compensable work-related injury." *Id.* at 466-467. The Appeals Court held that the insurer, in investigating liability, disputing a claim through DIA procedures, and pursuing the employer's rights under G. L. c. 152, was "standing in the shoes of the insured." *Id.* at 466. Accordingly, the plaintiff's G. L. c. 93A claim was barred by G. L. c. 152, § 24.

We most recently addressed the extension of G. L. c. 152's exclusivity provisions to workers' compensation insurers in the case of *Fleming* v. *National Union Fire Ins. Co.*, 445 Mass. 381 (2005) (*Fleming*). Three workers' compensation claimants brought suit against their employer's insurer under G. L. cc. 93A and 176D for alleged miscalculation of "average weekly wages" resulting in underpayment of workers' compensation benefits. *Id.* at 382. We concluded that G. L. c. 152, § 24, was inapplicable because that section applies to waiver of remedies, "at common law or under the law of any other jurisdiction," and the plaintiffs had brought claims based solely in Massachusetts statutes. *Id.* at 387-388. We held that the plaintiffs' claims remained barred, however, because "the 'deceptive and unfair business practices' alleged by the plaintiffs must be addressed through the comprehensive statutory framework of G. L. c. 152." *Id.* at 389. Specifically, we relied on the fact that "the Act and its related regulations were designed to address the types of claims that the plaintiffs have asserted here" and that "the comprehensive statutory framework of G. L. c. 152 provides injured workers with detailed procedures for addressing controversies pertaining to the payment of benefits and to the manner in which claims for benefits are handled, and sets forth its own remedial scheme for addressing noncompliance by employers and insurers." *Id.* at 385, 387. See *Kelly* v. *Raytheon, Inc.*, 29 Mass. App. Ct. 1000, 1002 (1990) (*Kelly*) ("the exclusivity provisions of § 24, in conjunction with the provisions in [G. L.] c. 152 which provide for penalties [against insurers] for delayed payment, reveal a legislative intent that the remedies provided by [G. L.] c. 152 for violations of that chapter should remain within the system and should be exclusive of all other common law and statutory remedies"). We thus held that, where there is overlap, the remedies of G. L. c. 152 are exclusive of those provided by G. L. c. 93A.

Given this case law, it is unsurprising that AIGDC's first two arguments regarding workers' compensation exclusivity focus on the purposes of the workers' compensation act rather than on statutory language. These arguments are not persuasive. AIGDC's final argument differs in that it rests on the language of G. L. c. 152, § 23. This argument fails to address the purposes or context of the statute and is thus unconvincing.

AIGDC first argues that workers' compensation exclusivity applies because Maxwell's claims are "grounded upon a dispute concerning AIGDC's determination that he was not entitled to worker's compensation benefits because of fraud." AIGDC's argument in this regard principally is based on our holding in the *Fleming* case that exclusivity must apply to claims falling within the "overarching workers' compensation framework." *Fleming, supra* at 383. See *Kelly, supra,* citing *Foley* v. *Polaroid Corp.,* 400 Mass. 82, 93 (1987) ("the need is to distinguish those claims that arise out of events unrelated to the subject matter of [G. L.] c. 152 . . . from those that arise out of and in the course of employment"). The analysis in *Fleming* is inapposite, however, because in that case the harm alleged — underpayment of workers' compensation benefits — was clearly subject to remedy under G. L. c. 152. See *Fleming, supra* at 382. See also G. L. c. 152, § 8 (5) ("if the insurer . . . fails to make any payments required under this chapter, and additional compensation is later ordered, the employee shall be paid by the insurer a penalty payment"); G. L. c. 152, § 10 (1) (DIA proceeding may address "a claim for compensation . . . or a complaint from any party requesting resolution of any issue arising under [G. L. c. 152]"). Here, the injuries alleged by Maxwell are entirely distinct from his right to receive workers' compensation benefits and are not contemplated by G. L. c. 152.

As quoted above, AIGDC's argument describes Maxwell's action as arising out of its "determination that he was not entitled to workers' compensation benefits because of fraud." Maxwell's first three counts, however, address AIGDC's conduct in "maliciously, without adequate investigation and without probable cause to believe the truth of the charges, caus[ing] a criminal complaint to be brought against [Maxwell]." The two issues, claim determination and fraud reporting, are entirely distinct.

First, the decision to report a transaction to the IFB cannot constitute a claim determination. As discussed above, an insurer is mandated to file a report when it has "reason to believe that an insurance transaction may be fraudulent." St. 1996, c. 427, § 13 (*e*). That is, an IFB report is required on the basis of mere suspicion rather than any determination, made in reliance on a reasonable investigation, that fraud has actually occurred or that the employee is not presently disabled. After filing this report, the insurer's discretionary duties are at an end, and its only role is to respond to IFB requests for information and otherwise cooperate with the investigation. St. 1996, c. 427, § 13 (*g*). Should a prosecutor determine that criminal proceedings are appropriate, the insurer's part is that of a victim or complaining witness and not that of a party.[13] The insurer's role in reporting potentially fraudulent transactions is thus distinct from its role in determining a claim, and the insurer's actions in the former role have no effect on its responsibilities in the latter.

Second, the procedural pathway by which claims determinations are made and contested leads through the DIA and not the Boston Municipal Court. The history of this case illustrates that the DIA and criminal proceedings are distinct and nonintersecting. When Maxwell filed his claim for benefits, AIGDC determined that benefits were not payable because of inadequate documentation and failure to demonstrate the necessary causation between injury and disability. Maxwell pursued his claim through the administrative procedures established by the DIA. See *Fleming*, *supra* at 384 (describing four procedural stages of workers' compensation dispute resolution). The DIA administrative judge ordered payment of benefits to Maxwell. When AIGDC determined that Maxwell's claim was not payable, it did not simply cease payment of benefits but, instead, filed its own pleading with the DIA. See G. L. c. 152, § 8 (2) (*c*) (insurer may discontinue benefits on order of DIA [conviction under G. L. c. 152, § 14 (3), is not among reasons permitting termination of benefits]). Indeed, the DIA retained jurisdiction over the question of Maxwell's entitlement to benefits even after Maxwell's decision to plead guilty in the criminal prosecution.

---

[13]This structure describes the intended operation of the fraud reporting and prosecution process rather than AIGDC's alleged course of conduct.

Similarly, proceedings in the criminal action were not contingent on the results of the DIA proceeding — when the Boston Municipal Court judge permitted Maxwell to withdraw his guilty pleas, the judge noted that the criminal proceeding was "not bound by the findings of the D.I.A. Administrative Judge."

AIGDC appears to accept this point because (in support of its statutory immunity argument) it takes the position that there are "enormous difference[s] between [the] civil, § 14 (2), and the broader criminal, § 14 (3), statutes" that underlie DIA and criminal proceedings. Considering these enormous differences and the fact that the criminal and claim determination processes are entirely distinct, we conclude that AIGDC's first argument is inapplicable to Maxwell's first three counts.

Regarding Maxwell's G. L. cc. 93A and 176D claim, AIGDC's argument also fails. The conduct complained of in this final count is somewhat amorphous given that the complaint incorporates by reference Maxwell's demand letter that, in turn, incorporates the facts set forth in the Appeal Court's decision affirming the denial of the special motion to dismiss.[14] *Maxwell v. AIG Domestic Claims, Inc.*, 72 Mass. App. Ct. 685 (2008). The demand letter provides some clarification by alleging that, "[a]s a result of the conduct of [AIGDC] and its employees, Mr. Maxwell became homeless, was denied medical treatment that even [AIGDC]'s doctors said was needed, was prosecuted criminally and driven to the point of attempting to take his own life." Maxwell's homelessness began during the period between AIGDC's initial denial of benefits and the DIA's order, in April, 2001, requiring payment of workers' compensation benefits. During this period AIGDC was engaged solely in contesting Maxwell's entitlement to benefits. AIGDC had not formed any suspicion regarding fraud, had reported nothing to the IFB, and had undertaken no conduct that would fall outside the rubric of claims-handling activity and thus the scope of workers' compensation exclusivity. Similarly, AIGDC's conduct in refusing to pay for Maxwell's shoulder surgery constitutes claims-handling activity that is within the exclusivity of G. L. c. 152.

The Appeals Court, however, also addressed conduct that is

---

[14]The propriety and sufficiency of this method of pleading have not been presented by the parties and, accordingly, are not addressed in this appeal.

not claims-handling activity or claims determination. *Maxwell v. AIG Domestic Claims, Inc., supra* at 695-697. Most notably, AIGDC's decision to lobby the probation department and the district attorney to secure surrender of Maxwell's probation had nothing to do with determining his eligibility for workers' compensation benefits. See G. L. c. 152, § 8 (2) (*j*) (insurer may not discontinue payments on basis of suspected fraud but may terminate benefits if "the employee has been incarcerated pursuant to conviction for a felony or misdemeanor"). Rather than constituting a claim determination, this conduct is better characterized as a collections effort. AIGDC recognized that Maxwell was homeless and likely to be judgment proof. Ceasing to pay benefits immediately, because of his incarceration, would thus further AIGDC's interests by securing in advance any order of restitution that might enter in its favor. Such collection efforts are not claims determinations and thus fall outside the comprehensive framework of regulation that would justify extending workers' compensation exclusivity to Maxwell's final claim. Accordingly, AIGDC's first argument does not entitle it to summary judgment on any of Maxwell's claims.

AIGDC's second argument, like its first, relies on the purposes rather than the language of G. L. c. 152. AIGDC begins by quoting the *Fleming* case to the effect that an "insurer, in receiving and investigating the employee's claim for benefits, [is] acting in furtherance of the goals of G. L. c. 152, and thus [is] protected from the employee's action by the exclusivity provision of § 24." *Fleming, supra* at 388, citing *Boduch, supra* at 466-467. AIGDC then notes that there is a strong public policy of rooting out workers' compensation fraud in which the Legislature has enlisted the efforts of the insurance industry. See St. 1996, c. 427, § 13. The necessary conclusion, AIGDC reasons, is that it would make no sense for the Legislature to have mandated that insurers report bare suspicions of fraud and then permit them to be sued by aggrieved claimants. AIGDC's argument is correct — such a result would undermine statutory purposes. This is not the result that actually obtains, however, because the Legislature has protected insurers from such suits through the grant of qualified immunity. St. 1996, c. 427, § 13 (*i*). Because the Legislature has acted to protect insurer

interests and has calibrated the degree of protection it desires, we find it unnecessary to stretch the purposes of G. L. c. 152 to include fraud reporting undertaken pursuant to another statute.

We begin analysis of this point by noting that, while fraud reporting under St. 1996, c. 427, § 13, may reduce the costs of workers' compensation insurance, this goal is subsidiary in comparison with the overarching purpose of G. L. c. 152 — "to ensure that employees, who give up their rights to sue employers in tort, will recover lost wages and lost earnings capacity and medical expenses resulting from work-related injuries, regardless of fault or forseeability." *Fleming, supra* at 384, quoting *Neff* v. *Commissioner of the Dep't of Indus. Accs.*, 421 Mass. 70, 75 (1995). Considering this order of priorities, it is not clear that the purposes of G. L. c. 152 are being furthered when an insurer's actions outside the claims determination process jeopardize a claimant's receipt of workers' compensation benefits. Further, fraud reporting is an activity ancillary to the principal role of workers' compensation insurers and is thus distinguished from the actions that we have held to be within the scope of exclusivity, including inspection of insured premises to reduce worker injuries, calculation of benefits, payment of benefits, and participation in the DIA benefit determination process. See *Fleming, supra* at 382; *Matthews, supra*; *Kelly, supra*; *Boduch, supra* at 464-465. None of these actions involves the activity seen here — collateral attacks on a claimant through processes outside the workers' compensation dispute resolution system.

Further, we are not convinced that the extension of workers' compensation exclusivity to fraud reporting would serve even the purposes of St. 1996, c. 427, § 13. That statute is designed to insulate insurers from the possibility of suits from aggrieved claimants by removing workers' compensation carriers at least two steps from any adverse action against the claimant. St. 1996, c. 427, § 13 *(f)-(h)*. If an insurer exceeds these bounds by providing misleading information to prosecutors and then attempts to gain leverage over the claimant by lobbying for his or her incarceration, the insurer has acted outside the scope of St. 1996, c. 427, § 13, and thus outside the area that the Legislature has seen fit to protect. *Id.* at § 13 *(i)*. Where a claimant alleges that an insurer has acted in furtherance of its private interests and has abused the qualified privilege available under § 13 *(i)*,

we hold that the purposes of G. L. c. 152 would not be furthered by shielding the insurer from tort liability by extending the chapter's exclusivity provisions to cover such conduct.

AIGDC's final argument is that Maxwell's acceptance of workers' compensation benefits "deprived the Superior Court of jurisdiction under G. L. c. 152, § 23." That statute states: "If an employee files any claim or accepts payment of compensation on account of personal injury under [G. L. c. 152] . . . such action shall constitute a release to the insurer of all claims or demands at common law, if any, arising from the injury." AIGDC cites no cases interpreting the statute but instead argues that the phrase "arising from" should be read expansively to include any injury that would not have occurred "but for" the workplace injury for which workers' compensation benefits were accepted.[15]

AIGDC's argument is undermined by the fact that it fails to address any of the decisions actually on point, including the leading case, *West's Case*, 313 Mass. 146 (1943).[16] This court interpreted G. L. c. 152, § 23, and held that "[t]he purpose of this section, which has always been a part of the workmen's

---

[15]AIGDC's brief cites a decision interpreting the long-arm jurisdiction statute, *Tatro* v. *Manor Care, Inc.*, 416 Mass. 763 (1994), and a decision interpreting the duty to defend contained in a homeowners' policy, *Metropolitan Prop. & Cas. Ins. Co.* v. *Fitchburg Mut. Ins. Co.*, 58 Mass. App. Ct. 818 (2003). In these cases an expansive reading was appropriate because of the unique interests involved. In the *Tatro* case, the long-arm statute was being read to the limit of constitutional authority because it is that limit that is held to be the point at which private and public interests are balanced. See *"Automatic" Sprinkler Corp. of Am.* v. *Seneca Foods Corp.*, 361 Mass. 441, 443-444 (1972). The Appeals Court had relied on the proposition that insurance policies are generally read against the insurer (where they are not drafted by regulators) because they resemble contracts of adhesion such that an expansive reading is necessary to counteract the imbalance of bargaining power existing at the time the contract was formed. See *Metropolitan Prop. & Cas. Ins. Co.* v. *Fitchburg Mut. Ins. Co.*, supra at 820-821. Here, the language at issue represents a legislative compromise between the employer's and employee's interests such that an expansive reading designed to shift this equilibrium would be inappropriate.

[16]We note that our recent decision in *Wentworth* v. *Henry C. Becker Custom Bldg. Ltd.*, 459 Mass. 768 (2011), had not yet been issued when this matter was briefed and argued. The conclusions reached herein are consistent with our holding that "[i]mmunity under the act applies to the '[i]nsured,' which is an employer who provides workers' compensation insurance to 'his employees.' " *Id.* at 772, quoting G. L. c. 152, § 1 (6).

compensation act . . . was to prevent an employee, who had proceeded under the act, from enforcing any rights at common law or under the employers' liability statutes against the employer." *Id.* at 153. The purpose of the statute is thus to secure a release that complements the exclusivity of G. L. c. 152, § 24. Further, the statute refers to a release of claims "to the insurer" not because the Legislature intended to provide the insurer with greater protections than those enjoyed by the employer but because, under the Commonwealth's compulsory workers' compensation system, it is the insurer and not the employer that actually pays claims to injured employees and would thus be the logical party to accept such a release. See G. L. c. 152, §§ 7 (1), 25A.

More important, the release contemplated by G. L. c. 152, § 23, can provide the insurer with no greater protections than its insured, the employer. As we have held repeatedly, there are claims that an employee may bring against his or her employer that are not subject to workers' compensation exclusivity, including actions for "defamation, malicious prosecution, false arrest and imprisonment, or for slander." L.Y. Nason, C.W. Koziol, & R.A. Wall, Workers' Compensation § 26.5, at 322 & nn. 1, 2 (3d ed. 2003), citing *Foley* v. *Polaroid Corp.*, 381 Mass. 545, 551-553 (1980) (defamation and malicious prosecution). See *Ezekiel* v. *Jones Motor Co.*, 374 Mass. 382, 392 (1978) (slander); *Zygmuntowicz* v. *American Steel & Wire Co. of N.J.*, 240 Mass. 421 (1922) (false arrest and imprisonment). See also *Doe* v. *Purity Supreme, Inc.*, 422 Mass. 563, 568 (1996) (false imprisonment). The injuries recoverable through these actions would not have occurred "but for" the employee's relationship with the employer, but yet they remain actionable. Why greater protection should be provided to workers' compensation insurers is not explained in AIGDC's brief. See *Boduch, supra* at 466 (exclusivity applies where "the insurer stands in the shoes of the employer").

We also note that, if such a rule applied, the insurer would be privileged to undertake with impunity any number of abusive or oppressive investigatory and retaliatory actions not recoverable under G. L. c. 152 that would not occur "but for" the insurer-claimant relationship. See *Hawkes* v. *Comercial Union Ins. Co.*,

764 A.2d 258, 264-266 (Me. 2001) (insurer's trespass into claimant's home was property claim rather than personal injury and thus not subject to exclusivity; insurer's infliction of emotional distress and invasion of privacy arose out of surveillance activities rather than benefit determination process and were thus actionable). Because of the pernicious consequences of such a doctrine, we conclude that AIGDC's argument is unpersuasive and AIGDC is not entitled to summary judgment by operation of G. L. c. 152, § 23.

5. *Conclusion.* For the reasons set forth herein, we hold that the qualified immunity claimed by AIGDC does not extend to conduct occurring outside the scope of St. 1996, c. 427, § 13, and that AIGDC, therefore, is not entitled to summary judgment on this ground. Similarly, AIGDC is not entitled to summary judgment due to the absence of subject matter jurisdiction, because none of Maxwell's claims rests solely on AIGDC's claims-handling activities. The order of the Superior Court is therefore affirmed, and the matter is remanded for further proceedings consistent with this opinion.

*So ordered.*